Case 1:18-cv-02641-JRS-TAB  Document 1-2  Filed 08/27/18  Page 1 of 60 PageID #: 7

29D01-1807-PL-006948
Hamilton Superior Court 1

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | HAMILTON SUPERIOR COURT |
| | )SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO.: 29D01- |

| | |
|---|---|
| KERRI L. AGEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NEWTEK BUSINESS SERVICES | ) |
| HOLDCO 5, INC, ADR PARTNERS, | ) |
| LLC d/b/a BANC-SERV | ) |
| PARTNERS, LLC, and a/k/a BANC- | ) |
| SERV PLUS, and NEWTEK | ) |
| BUSINESS SERVICES CORP. | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES, EQUITABLE RELIEF AND TO ENFORCE LIEN AND JURY DEMAND

## INTRODUCTION

1.  In 2002, Plaintiff, Kerri Agee-Crawford started banc-serv, a lender service provider that banks and other financial institutions rely upon for structuring, closing and servicing of Government backed loans to small businesses. banc-serv is not a lender; in essence, banc-serv is the outsourced "back office" for banks to participate in the Government's Small Business Administration lending program. Between 2002 and 2015, Ms. Agee grew banc-serv into one of the largest lender service providers in the country. Still, Ms. Agee saw numerous deals that were not closing because of the reluctance of banks to invest in small businesses.

2.  Newtek is a New York company with a sizeable footprint in SBA lending

to small businesses across the United States.  Newtek saw banc-serv as an investment opportunity to increase its SBA lending revenue through banc-serv's referrals to Newtek.  Newtek bought Ms. Agee's 100% membership interest in banc-serv in exchange for an up-front payment and a promise to pay Ms. Agee a commission on the referral income generated from banc-serv's clients to Newtek.

3.   Unfortunately for Ms. Agee, Newtek pulled a bait and switch.  Almost immediately after taking control of banc-serv, Newtek began deconstructing banc-serv while attempting to retain the core lender service provider functions Newtek required to continue its SBA lending enterprise.  Newtek also refused to honor its obligations to Ms. Agee.  As a result, Ms. Agee has suffered damages that can only be remedied in a court of law.

**JURISDICTION AND VENUE**

4.   Newtek Business Services Corp. ("Newtek") is a Maryland corporation with an address in Lake Success, New York.

5.   Newtek Business Services Holdco 5, Inc. ("Holdco") is a New York corporation with an address in Lake Success, New York.  Holdco is a wholly owned subsidiary of Newtek.

6.   Holdco was formerly known as banc-serv Acquisition, Inc. or banc-serv Acquisition Company, LLC up until November 8, 2017.

7.   ADR Partners, LLC d/b/a banc-serv Partners, LLC and a/k/a banc-serv

2

plus (referred to above and herein as "banc-serv" or the "Company") is incorporated both in Indiana and Delaware with a principal place of business at 777 East Main Street, Westfield, Indiana, 46074.

8.   Personal jurisdiction exists over the Defendants because Defendants conducted business in this forum and have sufficient minimum contacts such that this proceeding does not offend traditional notions of fair play and substantial justice.

9.   Venue is proper in this Court because the events described herein took place in Hamilton County, Indiana and thus Ms. Agee's claims arose in Hamilton County, Indiana.

## FACTUAL BACKGROUND

10. Ms. Agee and two other one-third owners formed banc-serv in or around March 2002.

11. banc-serv is a lender service provider ("LSP") that assists, among others, banks and other lenders in administering loans to small businesses through the United States Small Business Administration ("SBA").

12. Between 2002 and 2016, under Ms. Agee's leadership, banc-serv amassed a large network of clients, including banks and other lenders.

13. Prior to June 24, 2016, banc-serv did not have access to capital to function as both a lender and an LSP.

14.   One of the services Newtek provides is business lending.

15.   Prior to June 24, 2016, Newtek had a few banking clients to which it

provided LSP services, but Newtek was not heavily engaged as an LSP to banks.

16.   In or around 2015, banc-serv was awarded a contract with the Federal Deposit Insurance Corporation for servicing SBA 504 United States Department of Agriculture ("USDA") portfolios on struggling banks.

17.   Upon information and belief, the only other Government contractor for this program was Newtek.

18.   Newtek became interested in acquiring banc-serv and Ms. Agee was interested in joining Newtek so that together, they could offer "one-stop shopping" for banc-serv's clients and others to obtain both lending and LSP services through the same platform.

19.   Upon information and belief, Newtek was also interested in acquiring banc-serv so that it would be the only Government contractor for the SBA 504 USDA program.

20.   During negotiations, Barry Sloane, Newtek's President, Chairman and Chief Executive Officer, told Ms. Agee that banc-serv would continue to function like it always had under her leadership.

21.   During negotiations, Ms. Agee requested both money and stock in Newtek in exchange for her membership interests in banc-serv.  Barry Sloane declined to offer Ms. Agee Newtek stock.

22.   Ms. Agee sold banc-serv to Newtek for both an up-front payment of money and the promise of future income, both as a salary and as commission on loans and other services generated to Newtek from banc-serv's client base.

23.   During negotiations up until closing, Newtek never told Ms. Agee that banc-serv's expenses were going to increase after closing, or that Newtek would pay dividends to its shareholders out of banc-serv's revenue.

24.   On or about June 24, 2016, Holdco purchased 100% ownership of the membership interests in banc-serv from Ms. Agee.

25.   As such, Newtek, through its wholly owned consolidated subsidiaries, owns 100% of the membership interests of banc-serv.

26.   Newtek caused a delay in the closing of the purchase of Ms. Agee's 100% membership interest in banc-serv.  As a result, banc-serv incurred a penalty on an existing line of credit, which Newtek forced Ms. Agee to pay out of her proceeds from the sale of banc-serv.

27.   On or about June 24, 2016, Ms. Agee also entered into an employment agreement (the "Employment Agreement") with banc-serv which was later amended on or about November 15, 2016.  A true and correct copy of the Employment Agreement, with its amendment, is attached as Exhibit 1.

28.   In the Employment Agreement, Ms. Agee is referred to as "Executive."

29.   The Employment Agreement, as amended, provides for the following forms of compensation to Ms. Agee:

> 3. Base Compensation. The Company agrees to pay the Executive during the term of this Agreement a salary at the rate of $275,000.00 per annum, payable in cash not less frequently than monthly.
>
> 4. Cash Bonuses; Incentive Compensation.

(a) The Executive shall earn an annual bonus equal to thirteen and one half percent (13.5%) of the Company's annual pre-tax income, after giving effect to all other bonuses or commissions paid to Company employees or commissioned agents; this bonus will be pro-rated for periods of employment of less than one full year and shall be paid within ninety (90) days of the conclusion of the Company's fiscal year.

(b) The Executive shall also be entitled to a bonus derived from loan referral fees (the "Referral Bonus") paid to the Company by its affiliate, Newtek Business Services Corp., pursuant to the terms of an agreement, of even date herewith (the "Referral Agreement") with respect to business derived after the Effective Date from sources which were customers of the Company prior to the Effective Date. Executive shall be entitled to receive as additional compensation ninety percent (90%) of the amount of such loan referral fees paid to the Company under the Referral Agreement, after deducting the amount of any fees or commissions paid out by the Company with respect to the specific referred loans. The payment of the Referral Bonus shall terminate five (5) years from the Effective Date. In the event the Term of this Agreement ends prior to said five year period, the Executive will continue to receive the Referral Bonus in the form of independent contractor compensation for the balance of the five (5) years; provided, however, that if this Agreement is terminated for Just Cause consisting of a material breach of this Agreement, willful neglect of duties or conviction of a felony, all further payments of the Referral Bonus shall be forfeit and terminated.

30.    The Employment Agreement is governed by the laws of the State of New York, except to the extent preempted by Federal law.

31.    On or about June 24, 2016, Ms. Agee, on behalf of banc-serv, also executed a "Referral Promotion Agreement" with Newtek.  A true and correct copy of the Referral Promotion Agreement is attached as Exhibit 2.

32.    Under the Referral Promotion Agreement, for each pre-existing customer referred by the Company to Newtek for "a platform of services of value to

small businesses, including commercial business lending[ and] commercial real estate financing," Newtek would pay banc-serv "Referral Commission" pursuant to Schedule A of the Referral Promotion Agreement.

33.     Pursuant to the Referral Promotion Agreement, the "NewTracker™ System" is the means by which Newtek tracked data and information pertaining to the Referral Program.

34.     Complete information regarding the Referral Program is within Newtek's possession, custody and control.

35.     Under the Employment Agreement, Ms. Agee is entitled to ninety-percent (90%) of the Referral Commission owed to the Company pursuant to the Referral Promotion Agreement.

36.     Under the Employment Agreement, "Good Reason" is defined as:

> The Company (i) demotes Executive or assigns Executive to duties or responsibilities that are materially inferior to and inconsistent with Executive's position, duties and responsibilities immediately prior to such assignment; (ii) materially breaches any term or provision of this Agreement; (iii) reduces Executive's Base Compensation or changes the Cash Bonus or Incentive Compensation set forth in this Agreement; or (iv) requires that the Executive move her personal residence, or perform her principal executive functions, more than fifty (50) miles from her primary office as of the Effective Date, which shall be at 777 E. Main Street, Westfield, Indiana.

37.     Under the Employment Agreement, "Just Cause" is defined as:

> The Executive's willful misconduct, breach of fiduciary duty involving personal profit, failure to perform stated duties in a manner consistent with Board approval following notice thereof, conviction of a felony, or material breach of any provision of this Agreement. No act, or failure to act, on the Executive's part shall be considered "willful" unless she has acted, or failed to act, with an absence of good faith and without a reasonable belief that her action or failure to act was in the best interests of the Company.

38.     At the end of 2016, without the consent of Ms. Agee, Newtek took at least as much as $400,000.00 from banc-serv's account(s) as a distribution to its shareholders.

39.     Upon information and belief, Newtek's President, Chairman and Chief Executive Officer, Barry Sloane, is Newtek's largest shareholder.

40.     Without the consent of Ms. Agee, Newtek applied an expense of at least as much as $100,000.00 to banc-serv in 2016 for "corporate overhead."

41.     After closing, Newtek forced Ms. Agee personally to pay $75,000.00 to Newtek for legal and accounting fees incurred during the purchase of Ms. Agee's 100% membership interest in banc-serv.

42.     As a result of these expenses and others which Ms. Agee never agreed to prior to closing, banc-serv's net income decreased in 2016.  Net income is the basis for Ms. Agee's annual bonus under the Employment Agreement.

43.     Starting in or around early 2017, banc-serv, by and through Newtek, began diminishing Ms. Agee's role from her prior duties as President and Chief Executive Officer of banc-serv.

44.     Ms. Agee was told by Newtek's President, Chairman and Chief Executive Officer, Barry Sloane, that her job was just to sell, and not to actively manage the Company she founded and grew from 2002.

45.     Other banc-serv employees were told by Newtek that Ms. Agee was no longer the first line of inquiry for fixing issues related to the operations of banc-serv for projects which had previously been led by Ms. Agee.

46.     At the direction of Newtek, Ms. Agee was cut out from accounting meetings regarding banc-serv's finances.  Newtek completely controlled banc-serv's financial reporting after June 24, 2016.

47.     At the direction of Newtek, Ms. Agee was cut out from banc-serv's marketing strategy and oversight of the Company's marketing activities.  Newtek took banc-serv's marketing team from Ms. Agee and they began working for Newtek.

48.     Newtek told Ms. Agee that there was not enough money in banc-serv's bank account to fund payroll and that she would have to personally fund payroll, even though banc-serv always had enough money in its bank account to fund payroll prior to June 24, 2016.

49.     At the direction of Newtek, banc-serv's employees were tasked with LSP functions for Newtek's banking clients as an LSP for those clients directly. Newtek never credited banc-serv for this expense which, in effect, decreased banc-serv's net income.

50.     Upon information and belief, Newtek continued to attribute expenses to banc-serv which were not actually incurred by banc-serv in 2017 and 2018.

51.     Newtek has refused to reimburse banc-serv and Ms. Agee for Ms. Agee's business expenses which had previously been reimbursed by banc-serv.

52.     For example, Newtek refused to reimburse and insisted that Ms. Agee pay expenses incurred for banc-serv's 2016 annual holiday party and expenses

incurred to commemorate the work anniversaries of longstanding Company employees.

53.     Upon information and belief, after June 24, 2016, Newtek did not pursue a renewal of banc-serv's SBA 504 USDA program contract with the FDIC.

54.     Further, despite repeated claims and demands by Ms. Agee for payment of her Incentive Compensation, Newtek refused to uphold its end of the bargain and never paid banc-serv for, among others, the Referral Commission payments to which Ms. Agee is rightfully owed.

55.     Due to banc-serv's (at the direction and under the control of Newtek) restriction of Ms. Agee's duties and responsibilities to those materially inferior to and inconsistent with her prior position and duties, and the change in Ms. Agee's compensation from what she is entitled to under her Employment Agreement, Ms. Agee resigned her employment for Good Reason on April 9, 2018.

56.     After Newtek representatives received Ms. Agee's resignation, Newtek's President and Chief Executive Officer, Barry Sloane, called Ms. Agee to tell her that her employment was being terminated for Just Cause.

57.     Under the Employment Agreement, by resigning for Good Reason, Ms. Agee is entitled to "a total severance payment (the 'Severance Payment') equal to (i) Executive's base salary in effect at the time of termination for the entire Term, less (ii) all amounts paid the Executive under this Agreement."

58.   To date, banc-serv, at the direction and under the control of Newtek, has failed and refused to pay Ms. Agee's Severance Payment, which should total approximately $58,173.08.

59.   To date, Ms. Agee has not been paid any amounts for her Incentive Compensation (including for her Referral Bonus) for the vast majority of 2017 or any of 2018.  Further, upon information and belief, banc-serv, at the direction and under the control of Newtek, underpaid her for her 2016 annual bonus.

60.   Under the Employment Agreement, Ms. Agee is entitled to Referral Bonus payments through June 24, 2021.

61.   To date, Ms. Agee has not been paid any amounts for her annual bonus in 2017 or 2018.

62.   On or about May 29, 2013, when Ms. Agee was still the Chief Executive Officer and 100% owner of the membership interests of banc-serv, she executed a Guaranty in the amount of One Hundred Thousand Dollars ($100,000.00) in favor of Vision Investment & Trading, LLC, (the "Landlord") for banc-serv's commercial lease.

63.   On or about July 11, 2018, the Landlord, by counsel, notified Ms. Agee that "the key member" (*i.e.*, Newtek) "is weighing its options to shutter [banc-serv's] operations."

64.   The Landlord further notified Ms. Agee that "while there was a drop in the value of Newtek's stock of approximately 10%, the value of its stock has fully recovered and even posted gains in value."

11

65.     The Landlord further notified Ms. Agee that banc-serv has failed to pay its rent for the months of May, June and July, 2018.

66.     As such, the Landlord demanded payment from Ms. Agee as the guarantor in the amount of $86,971.01, upon threat of filling suit for the amounts owed plus attorney's fees.

67.     Prior to June 24, 2016, banc-serv was never three months in arrears on its rent.

## COUNT I – Violations of New York Wage Payment Laws

68.     Ms. Agee incorporates the allegations above as though fully stated herein.

69.     Under New York Labor Law § 190(1) "Wages" means the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis.

70.     Under New York Labor Law § 190(6) "Commission salesman" means any employee whose principal activity is the selling of any goods, wares, merchandise, services, real estate, securities, insurance or any article or thing and whose earnings are based in whole or in part on commissions.

71.     Under New York Labor Law § 191(1)(c) A commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment …

72.     Under New York Labor Law § 198-c An employer is obligated to reimburse its employee for expenses.

73.     Under New York Labor Law § 191(3) If employment is terminated, the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred . . .

74.     Under New York Labor Law § 198(1-a) In any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest, and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total wages found to be due . . .

75.     By and through the actions and inactions described above, banc-serv has failed to pay Ms. Agee's wages as a "commission salesman," has failed to pay her Severance Payment, and has failed to reimburse her for legitimate business expenses.

76.     Accordingly, banc-serv is liable to Ms. Agee for the full amount of any underpayment in an amount to be proven at trial, all reasonable attorney's fees, prejudgment interest, and liquidated damages equal to one hundred percent of the total wages found to be due.

<u>COUNT II</u> – Breach of Contract

77.     Ms. Agee incorporates the allegations above as though fully stated herein.

78.     The Employment Agreement is a binding and enforceable agreement.

13

79.    Ms. Agee achieved adequate performance of the Employment Agreement.  banc-serv breached the Employment Agreement with Ms. Agee by and through the actions and inactions described above.

80.    Ms. Agee has suffered damages due to banc-serv's breach.

81.    Accordingly, under New York Law, banc-serv is also liable to Ms. Agee for breach of contract in an amount to be proven at trial.

## COUNT III – Newtek's Liability for Banc-serv's Conduct

82.    Ms. Agee incorporates the allegations above as though fully stated herein.

83.    Newtek exercised such control over banc-serv with respect to the allegations above that banc-serv became a mere instrumentality of Newtek.

84.    Newtek took the actions above in order to injure Ms. Agee, which it did.

85.    Newtek is jointly and severally liable for any judgment against banc-serv for Ms. Agee's Wage Claim and Ms. Agee's breach of contract claim, including for attorney's fees for all actions caused by Newtek.

## COUNT IV – Tortious Interference with Contract

86.    Ms. Agee incorporates the allegations above as though fully stated herein.

87.    The Employment Agreement is a binding and enforceable contract.

14

88.     Newtek caused banc-serv to enter into the Employment Agreement with Ms. Agee; therefore, Newtek knew of the existence of the Employment Agreement.

89.     By and through its control over banc-serv and the actions and inactions described above, Newtek caused banc-serv to breach the Employment Agreement.

90.     Newtek is completely unjustified in causing banc-serv to breach the Employment Agreement with Ms. Agee.

91.     Accordingly, Newtek is also liable to Ms. Agee for tortious interference with a contract in an amount to be proven at trial.

### COUNT V – Request to Appoint Receiver and Set Aside Fraudulent Transfer

92.     Ms. Agee incorporates the allegations above as though fully stated herein.

93.     By and through its control over banc-serv and the actions and inactions described above, Newtek has made transfers and caused banc-serv to incur obligations with the intent to hinder, delay, or defraud banc-serv's creditors, including Ms. Agee.

94.     By and through its control over banc-serv and the actions and inactions described above, Newtek has made transfers and caused banc-serv to incur obligations without receiving reasonably equivalent value in exchange.

95.     By and through its control over banc-serv and the actions and inactions described above, Newtek has caused banc-serv to incur debts beyond its ability to pay.

96.     By and through its control over banc-serv and the actions and inactions described above, Newtek has caused banc-serv to become undercapitalized in relation to the business and transactions banc-serv generates.

97.     As a result of the foregoing, banc-serv is either insolvent or is in imminent danger of insolvency.

98.     All such fraudulent transactions should be set aside by the Court in favor of Ms. Agee's right to recover for her claims.

99.     To accomplish this purpose, pursuant to Indiana Code § 32-30-5-1(5), the Court should appoint a receiver over banc-serv.

<u>COUNT VI</u> – Claim to Enforce Lien

100.    Ms. Agee incorporates the allegations above as though fully stated herein.

101.    On July 27, 2018, Ms. Agee filed a notice of her intention to hold a lien upon banc-serv's property and earnings in the Hamilton County Recorder's Office. *See* <u>Exhibit 3</u>.

102.    By virtue of the foregoing, Ms. Agee has acquired a lien pursuant to Indiana Code § 32-38-12-1, *et seq.*

103.    The Court should render judgment for Ms. Agee's claims, as stated herein, and shall declare these claims a lien upon banc-serv's property and order

the property sold to pay and satisfy the judgment and costs, and shall make orders as to the application of the earnings of banc-serv that are just and equitable.

### PRAYER FOR RELIEF

104.    WHEREFORE, Ms. Agee respectfully requests that the Court enter judgment against all Defendants; that Ms. Agee be awarded damages, including exemplary and liquidated damages, plus pre- and post-judgment interest; that Ms. Agee be awarded reasonable attorneys' fees, costs and expenses that she incurred in bringing this case; that the Court set aside fraudulent transfers that may otherwise prevent Ms. Agee from recovering damages; and that the Court award any such other relief as it deems proper

### JURY DEMAND

105.    Ms. Agee hereby demands a trial by jury on any claims so triable.

Respectfully submitted,

*/s/ Jonathan A. Bont*
Jonathan A. Bont          (28476-49)
PAGANELLI LAW GROUP

10401 N. Meridian St., Suite 450
Indianapolis, IN  46290
Tel:  317/550-1855
Fax:  317/569-6016
E-Mail:  jon@paganelligroup.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed with the Hamilton County

Superior Court on July 27, 2018.


*/s/ Jonathan A. Bont*
Jonathan A. Bont

18

Case 1:18-cv-02641-JRS-TAB   Document 1-1   Filed 08/27/18   Page 19 of 60 PageID #: 25
29D01-1807-PL-006948   Filed: 7/27/2018 2:24 PM
Hamilton Superior Court 1
Tammy Baitz
Clerk
Hamilton County, Indiana

## ADR PARTNERS, LLC

---

## Employment Agreement with
## Kerri L. Agee

---

***PREAMBLE***.  This Agreement entered into this 24th day of June 2016, by and between ADR Partners, LLC (the "Company") and KERRI L. AGEE (the "Executive"), effective immediately.

**WHEREAS,** the Executive is to be employed by the Company as an executive officer in the capacity of President and Chief Executive Officer; and

**WHEREAS,** the parties desire by this writing to set forth the employment relationship of the Company and the Executive.

**NOW, THEREFORE,** it is **AGREED** as follows:

1.      <u>Defined Terms</u>

When used anywhere in the Agreement, the following terms shall have the meaning set forth herein.

(a)      *"Board"* shall mean the Board of Managers of the Company.

(b)      *"Code"* shall mean the Internal Revenue Code of 1986, as amended from time to time, and as interpreted through applicable rulings and regulations in effect from time to time.

(c)      *[reserved]*

(d)      *"Company"* shall mean ADR Partners, LLC., and any successor to its interest.

(e)      *"Effective Date"*  shall mean the date of execution referenced in the Preamble of this Agreement.

(f)      *"Executive"* shall mean Kerri L. Agee.

(g)      *"Good Reason"* shall mean the Company (i) demotes Executive or assigns Executive to duties or responsibilities that are materially inferior to and inconsistent with Executive's position, duties and responsibilities immediately prior to such assignment; (ii) materially breaches any term or provision of this Agreement; (iii) reduces Executive's Base Compensation or changes the Cash Bonus or Incentive Compensation set forth in this Agreement; or (iv) requires that the Executive move her personal residence, or perform her principal executive functions, more than fifty (50) miles from her primary office as of the Effective Date, which shall be at 777 E. Main Street, Westfield, Indiana.

**EXHIBIT**

**1**

tabbies

(h)   *"Just Cause"* shall mean the Executive's willful misconduct, breach of fiduciary duty involving personal profit, failure to perform stated duties in a manner consistent with Board approval following notice thereof, conviction of a felony, or material breach of any provision of this Agreement. No act, or failure to act, on the Executive's part shall be considered "willful" unless she has acted, or failed to act, with an absence of good faith and without a reasonable belief that her action or failure to act was in the best interests of the Company.

2.   Employment.  The Executive is employed as the President and Chief Executive Officer of the Company.  The Executive shall render such administrative and management services for the Company and its subsidiaries as are currently rendered and as are customarily performed by persons situated in a similar executive capacity and consistent with the duties of a President and Chief Executive Officer.  The Executive shall report to the Chairman of the Board. The Executive shall also promote, by entertainment or otherwise, as and to the extent permitted by law, the business of the Company and its subsidiaries.  The Executive's other duties shall be such as the Chairman and the Board may from time to time reasonably direct, including normal duties as an officer of the Company.

3.   Base Compensation.  The Company agrees to pay the Executive during the term of this Agreement a salary at the rate of $275,000.00 per annum, payable in cash not less frequently than monthly.

4.   Cash Bonuses; Incentive Compensation.

(a)  The Executive shall earn an annual bonus equal to fifteen percent (15%) of the Company's annual pre-tax income, after giving effect to all other bonuses or commissions paid to Company employees or commissioned agents; this bonus will be pro-rated for periods of employment of less than one full year and shall be paid within ninety (90) days of the conclusion of the Company's fiscal year.

(b) The Executive shall also be entitled to a bonus derived from loan referral fees (the "Referral Bonus") paid to the Company by its affiliate, Newtek Business Services Corp., pursuant to the terms of an agreement, of even date herewith (the "Referral Agreement") with respect to business derived after the Effective Date from sources which were customers of the Company prior to the Effective Date.  Executive shall be entitled to receive as additional compensation one hundred percent (100%) of the amount of such loan referral fees paid to the Company under the Referral Agreement, after deducting the amount of any fees or commissions paid out by the Company with respect to the specific referred loans.  The payment of the Referral Bonus shall terminate five (5) years from the Effective Date.  In the event the Term of this Agreement ends prior to said five year period, the Executive will continue to receive the Referral Bonus in the form of independent contractor compensation for the balance of the five (5) years; provided, however, that if this Agreement is terminated for Just Cause consisting of a material breach of this Agreement, willful neglect of duties or conviction of a felony, all further payments of the Referral Bonus shall be forfeit and terminated.

5.    <u>Other Benefits</u>.

    (a)    *Participation in Retirement, Medical and Other Plans*.  The Executive shall participate in any plan that the Company maintains for the benefit of its employees if the plan relates to (i) pension, profit-sharing, or other retirement benefits, (ii) medical insurance or the reimbursement of medical or dependent care expenses, or (iii) other group benefits, including disability and life insurance plans.

    (b)    *Executive Benefits; Expenses*. The Executive shall be reimbursed for all reasonable out-of-pocket business expenses which she shall incur in connection with her services under this Agreement upon substantiation of such expenses in accordance with the policies of the Company.

6.    <u>Term</u>.  The Company hereby employs the Executive, and the Executive hereby accepts such employment under this Agreement, for the period commencing on the Effective Date and ending on June \_\_\_\_, 2018 or such earlier date as is determined in accordance with Section 11 (the "Term")."

7.    <u>Loyalty; Noncompetition</u>.

    (a)    During the period of her employment hereunder and except for illnesses, reasonable vacation periods, and reasonable leaves of absence, the Executive shall devote substantially all her full business time, attention, skill, and efforts to the faithful performance of her duties hereunder.  During the Term of her employment under this Agreement, the Executive shall not engage in any business or activity contrary to the business affairs or interests of the Company.

    (b)    Nothing contained in this Paragraph 7 shall be deemed to prevent or limit the Executive's right to invest in the capital stock or other securities of any business dissimilar from that of the Company or, solely as a passive or minority investor, in any business.

8.    <u>Standards</u>.  The Executive shall perform her duties under this Agreement in accordance with such reasonable standards as the Board may establish from time to time.  The Company will provide Executive with the working facilities and staff customary for similar executives and necessary for her to perform her duties.

9.    <u>Vacation and Sick Leave</u>.  At such reasonable times as the Board shall in its discretion permit, the Executive shall be entitled, without loss of pay, to absent herself voluntarily from the performance of her employment under this Agreement, all such voluntary absences to count as vacation time; provided that:

    (a)    The Executive shall be entitled to an annual vacation in accordance with the policies that the Board periodically establishes for senior management Executives of the Company.

    (b)    The Executive shall not receive any additional compensation from the Company on account of her failure to take a vacation, and the Executive shall not accumulate

unused vacation from one fiscal year to the next, except in either case to the extent authorized by the Board.

(c)     In addition to the aforesaid paid vacations, the Executive shall be entitled without loss of pay, to absent herself voluntarily from the performance of her employment with the Company for such additional periods of time and for such valid and legitimate reasons as the Board may in its discretion determine.  Further, the Board may grant to the Executive a leave or leaves of absence, with or without pay, at such time or times and upon such terms and conditions as such Board in its discretion may determine.

(d)     In addition, the Executive shall be entitled to an annual sick leave benefit as established by the Board.

10.     <u>Indemnification</u>.  The Company shall indemnify the Executive for costs and damages incurred by the Executive in the good faith performance of her duties under this agreement.

11.     <u>Termination and Termination Pay</u>.  Subject to Section 12 hereof, the Executive's employment hereunder may be terminated under the following circumstances:

(a)     *Just Cause*.  The Board may, based on a good faith determination and only after giving the Executive written notice immediately terminate the Executive's employment at any time, for Just Cause.  The Executive shall have no right to receive compensation or other benefits for any period after termination for Just Cause.

(b)     *Without Just Cause*.  The Board may, by written notice to the Executive, immediately terminate her employment for a reason other than Just Cause.  In such event, the Executive shall be entitled to a total severance payment (the "Severance Payment") equal to (i) Executive's base salary in effect at the time of termination for the entire Term, less (ii) all amounts paid the Executive under this Agreement.  The Severance Payment shall be paid in equal installments over a six (6) month period following the Executive's termination of employment, payable in accordance with the Company's regularly scheduled payroll (the "Installment Payments").  Each Installment Payment shall be treated as a separate payment for purposes of Treasury Regulations Section 1.409A-2(b)(2)(iii).  In addition, the Executive will be entitled to health, life, disability and other benefits which the Executive would have been eligible to participate in through the expiration of the Term based on the benefit levels substantially equal to those that the Company provided for the Executive at the date of termination of employment, subject to any restrictions as may be required under Code Section 409A.

(c)     *Resignation by Executive with Good Reason*.  The Executive may at any time immediately terminate employment for Good Reason, in which case the Executive shall be entitled to receive the Severance Payment payable in the same manner and on the same basis as provided for under Section 11(b) of the Agreement upon a termination without Just Cause.  In addition, the Executive will be entitled to health, life, disability and other benefits which the Executive would have been eligible to participate in through the expiration of the Term based on the benefit levels substantially equal to those that the Company provided for the Executive at the

date of termination of employment, subject to any restrictions as may be required under Code Section 409A.

      (d)    *Resignation by Executive without Good Reason.* The Executive may voluntarily terminate employment with the Company during the term of this Agreement, upon at least 60 days' prior written notice to the Board of Directors, in which case the Executive shall receive only her compensation, vested rights and Executive benefits up to the date of her termination of employment.

     12.    <u>Covenants</u>.

      (a)    <u>Definitions</u>. For purposes of this Agreement:

         (i)    <u>Restrictive Period</u>. The term "Restrictive Period" shall mean the period beginning on the Effective Date and ending two (2) years after the termination of the Executive's employment hereunder, including any extension hereof.

         (ii)    <u>Covered Customer</u>. The term "Covered Customer" shall mean (A) during the Term, any customer of the Company and (B) after the Term, any person or entity who was, as of the end of the Term, a customer of the Company.

         (iii)    <u>Covered Business</u>. The term "Covered Business" shall mean (A) during the term, any business in which the Company is engaged and (B) after the Term, any business in which the Company was engaged as of the end of the Term.

         (iv)    <u>Covered State</u>. The term "Covered State" shall mean (A) during the Term, any state in the United States and (B) after the Term, any state (1) in which, as of the end of the Term, the Company was engaged in business or (2) with respect to which the Company, as of the end of the Term, had expended material expense and/or efforts in connection with preparing to do business therein.

      (b)    <u>Non-Interference</u>. The Executive covenants and agrees that she will not at any time during the Restrictive Period for whatever reason, whether for her own account or for the account of any other person, firm, corporation or other business organization: (i) interfere with contractual relationships between the Company and any of its customers or employees; (ii) hire or solicit for hire any person who is employed by the Company or any parent or subsidiary of the Company, without the express written consent of the Company; or (iii) other than on behalf of the Company, solicit any Covered Customer of the Company in connection with the engagement, by any person or entity, in any Covered Business in any Covered State.

      (c)    <u>Confidentiality</u>. The Executive will not, at any time whether during or after her termination of employment, (i) disclose to anyone, without proper authorization from the Company, or (ii) use, for her or another's benefit, any confidential or proprietary information of the Company or any parent or subsidiary of the Company, except as set forth in this Agreement, which may include trade secrets, business plans or outlooks, financial data, marketing or sales programs, customer lists, brand formulations, training and operations manuals, products or price strategies, mergers, acquisitions, and/or Company personnel issues. ("Confidential Information"); provided, however, the restrictions contained in this <u>Section 12(c)</u>

shall not be applicable to the extent any Company information (i) was or becomes generally available to the public other than as a result of a disclosure by the Executive receiving the Confidential Information in violation of this Agreement, or (ii) was or becomes available to Executive on a non-confidential basis from a source other than the Company or its members, managers, directors, officers, employees, partners, agents or advisors (collectively, "**Company Representatives**"), provided, that such source was not known by the Executive to be bound by any agreement or obligation to keep such information confidential. Notwithstanding anything to the contrary contained herein, Executive may disclose the Confidential Information to Company Representatives who need to know such Confidential Information to perform their duties, are informed of its confidential nature, and agree to abide by this Section 12(c). In the event that Executive is required by law, regulation, supervisory authority or other applicable judicial or governmental order to disclose any of the Confidential Information, Executive shall provide Company with prompt written notice of any such request or requirement so that Company may seek a protective order or other appropriate remedy.

(d)     Blue Pencil; Equitable Relief. The provisions contained in this Section 12 as to the time periods, scope of activities, persons or entities affected and territories restricted shall be deemed divisible so that if any provision contained in this Section is determined to be invalid or unenforceable, such provision shall be deemed modified so as to be valid and enforceable to the full extent lawfully permitted. The Executive acknowledges that the provisions of this Section 12 are reasonable and necessary for the protection of the Company and that the Company will be irrevocably damaged if such covenants are not specifically enforced. Accordingly, the Executive agrees that if he breaches or threatens to breach any of the covenants contained in this Section 12, the Company will be entitled (i) to damages sufficient to compensate the Company for any harm to the Company caused thereby and (ii) to specific performance and injunctive relief for the purpose of preventing the breach or threatened breach thereof without bond or other security or a showing that monetary damages will not provide an adequate remedy, in addition to any other relief to which the Company may be entitled under this Agreement."

13.     Successors and Assigns.

(a)     This Agreement shall inure to the benefit of and be binding upon any corporate or other successor of the Company which shall acquire, directly or indirectly, by merger, consolidation, purchase or otherwise, all or substantially all of the assets or stock of the Company.

(b)     Since the Company is contracting for the unique and personal skills of the Executive, the Executive shall be precluded from assigning or delegating her rights or duties hereunder without first obtaining the written consent of the Company.

14.     Corporate Authority. Company represents and warrants that the execution and delivery of this Agreement by it has been duly and properly authorized by the Board and that when so executed and delivered this Agreement shall constitute the lawful and binding obligation of the Company.

15.     Amendments.  No amendments or additions to this Agreement shall be binding unless made in writing and signed by all of the parties, except as herein otherwise specifically provided.

16.     Applicable Law.  Except to the extent preempted by Federal law, the laws of the State of New York shall govern this Agreement in all respects, whether as to its validity, construction, capacity, performance or otherwise.

17.     Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

18.     Entire Agreement.   This Agreement, together with any understanding or modifications thereof as agreed to in writing by the parties, shall constitute the entire agreement between the parties hereto with respect to the matters addressed and shall supercede all previous agreements with respect to such matters.

19.     Tax Matters.  All payments or benefits provided under this Agreement are subject to any applicable employment or tax withholdings or deductions.  In addition, the parties hereby agree that it is their intention that all payments or benefits provided under this Agreement be exempt from, or if not so exempt, comply with, Code Section 409A and this Agreement shall be interpreted accordingly.  Notwithstanding anything in this Agreement to the contrary, if any payments or benefits made or provided under the Agreement are considered deferred compensation subject to Code Section 409A payable on account of Employee's separation from service (but that do not meet an exemption under Code Section 409A, including without limitation the short term deferral or the separation pay plan exemption), such payments or benefits shall be paid no earlier than the date that is six (6) months following Employee's separation from service (or, if earlier, the date of death) to the extent required by Code Section 409A.

[signatures on following page]

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first hereinabove written.

Witnessed by:                                    ADR PARTNERS, LLC.


_____         By: _____
                                                 Its:     Chairman
Witnessed by:


_____         _____
                                                      Kerri L. Agee

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first hereinabove written.

ADR PARTNERS, LLC.


By:_____
Its:     Chairman



_____
Kerri L. Agee

8

Execution

## ADR PARTNERS, LLC

---

## Amendment to Employment Agreement with
## Kerri L. Agee

---

**PREAMBLE**.  This Amendment to Employment Agreement (the "Amendment") is entered into this 15th day of November 2016, by and between ADR PARTNERS, LLC (the "Company") and KERRI L. AGEE (the "Executive"), effective as of June 23, 2016.

**WHEREAS,** the Executive and the Company entered into an Employment Agreement effective as of June 23, 2016 (the "Employment Agreement"); and

**WHEREAS,** the parties desire by this writing to amend and replace Section 4 of the Employment Agreement.

**NOW, THEREFORE,** it is **AGREED** as follows:

1.      The Employment Agreement is hereby amended by deleting Section 4 in its entirety and replacing it with the following:

        4.      Cash Bonuses; Incentive Compensation.

        (a)  The Executive shall earn an annual bonus equal to ~~fifteen~~ thirteen and one half percent (13.5%) of the Company's annual pre-tax income, after giving effect to all other bonuses or commissions paid to Company employees or commissioned agents; this bonus will be pro-rated for periods of employment of less than one full year and shall be paid within ninety (90) days of the conclusion of the Company's fiscal year.

        (b) The Executive shall also be entitled to a bonus derived from loan referral fees (the "Referral Bonus") paid to the Company by its affiliate, Newtek Business Services Corp., pursuant to the terms of an agreement, of even date herewith (the "Referral Agreement") with respect to business derived after the Effective Date from sources which were customers of the Company prior to the Effective Date.  Executive shall be entitled to receive as additional compensation ninety~~one hundred~~ percent (91~~00~~%) of the amount of such loan referral fees paid to the Company under the Referral Agreement, after deducting the amount of any fees or commissions paid out by the Company with respect to the specific referred loans.  The payment of the Referral Bonus shall terminate five (5) years from the Effective Date.  In the event the Term of this Agreement ends prior to said five year period, the Executive will continue to receive the Referral Bonus in the form of independent contractor compensation for the balance of the five (5) years; provided, however, that if this Agreement is terminated for Just Cause consisting of a material breach of this Agreement, willful neglect of duties or conviction of a felony, all further payments of the Referral Bonus shall be forfeit and terminated.

2.      Except as set forth in this Amendment, all other provisions of the Employment Agreement remain in full force and effect and are hereby ratified and confirmed in all respects.

3.      Amendments.  No amendments or additions to this Amendment shall be binding unless made in writing and signed by all of the parties, except as herein otherwise specifically provided.

4.      Applicable Law.  Except to the extent preempted by Federal law, the laws of the State of New York shall govern this Agreement in all respects, whether as to its validity, construction, capacity, performance or otherwise.

5.      Entire Agreement.  This Amendment together with the Employment Agreement shall constitute the entire agreement between the parties hereto with respect to the matters addressed and shall supercede all previous agreements with respect to such matters.

[signatures on following page]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove written.

ADR PARTNERS, LLC.

By:_____
Its:     Chairman

By:_____
         Kerri L. Agee

29D01-1807-PL-006948

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

Hamilton Superior Court 1

## REFERRAL PROMOTION AGREEMENT

This **REFERRAL PROMOTION AGREEMENT** (the "**Agreement**"), is made as of June 24, 2016 (the "**Effective Date**"), by and between **Newtek Business Services Corp.** ("**Newtek**"), a Maryland corporation, having an address of 1981 Marcus Avenue, Suite 130, Lake Success, New York 11042, and **ADR Partners, LLC**, d/b/a Banc-Serv Partners, LLC, having an address at 777 East Main Street, Westfield, IN 46074 ("**Contractor**").

## W I T N E S S E T H :

WHEREAS, Newtek operating through its portfolio companies and/or subsidiaries, **Newtek Small Business Finance, LLC d/b/a Newtek Business Finance Solutions and Small Business Lending, LLC d/b/a Newtek Small Business Lending** (collectively, the "**Affiliated Companies**" and individually, an "**Affiliated Company**"), provides a platform of services of value to small businesses, including commercial business lending, commercial real estate financing (collectively, the "**Newtek Services**" and individually, a "**Newtek Service**");

WHEREAS, Contractor wishes to take advantage of the platform offered by Newtek and refer the Newtek Services to its customers; and

WHEREAS, Newtek is willing to make the investment of its resources and technology and desires to have Contractor participate in the Newtek platform and refer the Newtek Services to its customers under the terms and conditions herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are each hereby acknowledged, the parties hereto agree as follows:

1.    Retention

Newtek hereby retains Contractor for the Term specified in paragraph 2 below, and Contractor accepts such retention upon the terms and conditions hereinafter set forth.

2.    Term

The term of this Agreement shall commence as of the Effective Date and shall continue in full force and effect until the fifth (5th) anniversary of the Effective Date (hereinafter the "**Term**").

3.    Duties and Responsibilities

a.    Throughout the Term, Contractor, subject to the terms and conditions hereof (including, but not limited to, subparagraph 4(b) below), shall be permitted to participate in Newtek's Referral Program (the "**Referral Program**"), with respect to U.S Small Business Administration loans, a description of which is annexed hereto as Schedule A and incorporated herein by reference. As a participant in the Referral Program, Contractor shall perform services to procure referrals for one or more of the Newtek Services as more particularly described on Schedule A. Contractor's services hereunder shall not be full-time. Newtek and the Affiliated

**EXHIBIT**

**2**

tabbies®

Companies have the right during and after the Term to service all needs of any customer referred to any of them by Contractor hereunder, including offering and selling additional Newtek Services to such referred customers. Newtek will use commercially reasonable efforts to service each customer referred to Newtek. If Newtek is unable to service a referral, it will notify Contractor within five (5) business days of submission of the referral.

      b.    Subject to the provisions of Section 6, Contractor shall have ordinary and customary access to the Referral Program and the NewTracker™ System (as hereinafter defined). Contractor shall enter all customers referred to Newtek or an Affiliated Company hereunder in the NewTracker™ System.

      c.    Contractor shall obtain Newtek's written approval prior to Contractor's use of any materials Contractor intends to use to promote the Newtek Services. Newtek will assist in the design of this material. Contractor will be responsible for: (i) all costs associated with the design, development, printing and mailing (including postage) of any such marketing material; and (ii) other than marketing materials prepared by Newtek in the ordinary course of its business, which shall be provided to Contractor at no cost to Contractor, all other marketing costs incurred by Contractor in connection with the services to be rendered by Contractor under this Agreement including, but not limited to, any and all travel, lodging and telephone expenses shall be the responsibility of Contractor.

      d.    Contractor shall not make any representations or warranties relating to the Newtek Services except as expressly permitted by Newtek in writing, or as expressly stated in the Newtek marketing literature provided to Contractor by Newtek. Under no circumstances shall Contractor have the authority to bind or commit Newtek or any of the entities providing the Newtek Services to any price, condition or obligation regarding the Newtek Services or anything else.

      e.    It is agreed that Contractor will not, at any time, modify the documents of Newtek and/or an Affiliated Company which are utilized in the performance of Contractor's obligations under this Agreement without the approval of Newtek. This includes, but is not limited to, all logos, stationery, letterhead, brochures, business cards, websites and any and all sales, marketing and/or support material that may be provided to Contractor. Any modifications by Contractor must be approved in writing by Newtek.

      f.    In the event that Contractor is an entity which will perform services hereunder through its employees, agents or representatives, Contractor agrees to inform such individuals of the material terms of this Agreement, limitation of authority (subparagraph 3(d)) and confidentiality of information (paragraph 6), and to require the compliance by such individuals with the Contractor's commitments herein.

      g.    Contractor may only use the names of Newtek partners and strategic alliances when promoting Newtek and all Newtek services with Newtek's prior written approval. Newtek may at any time notify Contractor to stop using names, marks, symbols, logos, etc. of any or all Newtek partners and strategic alliances. Upon receipt of such request, Contractor will immediately cease using the names of any or all Newtek partners and strategic alliances, and will

2

promptly return to Newtek any and all written materials, whether prepared by Newtek or Contractor, that contain such information.

4.   Compensation

(a)   Provided Contractor complies with Contractor's obligations set forth herein (including, but not limited to, those set forth in paragraph 3 hereof), Contractor shall receive compensation in consideration of each Newtek Service for which the Contractor referred a customer to Newtek or an Affiliated Company in accordance with Section 3 and which was provided to such referred customer as a result of the referral as set forth in the column entitled Referral Commission on Schedule A.  However, compensation shall only be paid with respect to referrals derived from sources which were existing customers of the Company prior to the Effective Date and which are listed on Schedule B, which is incorporated herein by reference; provided, however, that no compensation shall be paid with respect to referrals from Capital One Bank or its affiliates.

(b)   Compensation is earned (i) when the customer pays for the Newtek Service for which it was referred to Newtek or an Affiliated Company hereunder if the service is billed over time; or (ii) when the Customer has paid for the Newtek Service in full if Newtek Service for which it was referred to Newtek or an Affiliated Company hereunder is provided as a one-time service. Notwithstanding anything herein to the contrary and for the avoidance of doubt, in the event Contractor is paid any compensation hereunder the basis for which is subsequently reduced, corrected or adjusted, (via refund, chargeback, accounting correction, error correction, etc. or the like) Newtek may adjust and offset against Contractor's future compensation to be paid hereunder to reflect such reductions, corrections or adjustments. Upon termination, Newtek shall be obligated to pay the Contractor all compensation earned prior to the effective date of the effective date of the termination and such compensation will be paid to the Contractor in one final payment and no further payments shall be made.  Contractor shall not be entitled to compensation for any Newtek Services provided or sold following the date of termination.

5.   Independent Contractor

a.   In all activities hereunder, Contractor shall be an independent contractor, although Contractor may hold itself out as being an independent sales representative of Newtek and the Affiliated Companies.

b.   Newtek and the Affiliated Companies shall have no liability whatsoever for withholding, collection or payment of income taxes or for taxes of any other nature payable by Contractor, Contractor hereby acknowledging that it is an independent contractor.

6.   NewTracker™

Newtek agrees to and does hereby grant to Contractor, during the term of this Agreement including any extensions, and upon the terms and conditions hereinafter set forth, the right and license to use the NewTracker™ System (the "NewTracker™ System").  Newtek reserves all rights to the NewTracker™ System except as specifically granted herein to Contractor. Contractor shall not use or permit any other party to use the NewTracker™ System in any other

3

configuration, manner or medium other than for the purposes set forth in this Agreement. No license is granted hereunder for the use of the NewTracker™ System for any purpose other than as provided in this Agreement. Upon expiration of the Term, all of Contractor's rights to use the NewTracker™ System shall immediately and automatically terminate. The right to use NewTracker™ granted to Contractor pursuant to this Section 6, is granted for use with specific Newtek Services, and when a Newtek Service is cancelled or terminated all access to historical and/or current referral information with respect to any such terminated Newtek Service shall immediately cease to be available to Contractor through NewTracker™ .

7.     Protection of Confidential Information

a.     Contractor shall not disclose the terms or conditions of this Agreement to any third party, nor issue any public statements relating to this Agreement without the prior written consent of Newtek, unless such disclosure or statement is reasonably believed by Contractor to be compelled by law or governmental authority and prior written notice thereof is given to Newtek.

b.     Contractor agrees that Contractor's services hereunder are of a special, unique, extraordinary and intellectual character and Contractor's relationship with Newtek places Contractor in a position of confidence and trust with the clients or customers and agents of Newtek, as well as the Affiliated Companies.

c.     "**Confidential Information**" means:   (i) the terms and conditions of this Agreement; (ii) Newtek, or an Affiliated Company's trade secrets, business plans, strategies, know-how, business methods and/or practices; and (iii) other information relating to Newtek, or an Affiliated Company that is not generally known to the public, including information about the members, personnel, products, marketing strategies, services or future business plans. Notwithstanding the foregoing, the term "Confidential Information" specifically excludes (a) information that is now in the public domain or subsequently enters the public domain by publication or otherwise through no action or fault of the receiving party; (b) information that is known to the receiving party without restriction, prior to receipt from the disclosing party under this Agreement, from its own independent sources as evidenced by the receiving party's written records, and which was not acquired, directly or indirectly, from the other party or through or as a result of any breach of any agreement with any party; (c) information that any party receives from a third party reasonably known by such receiving party to have a legal right to transmit such information, and not under any obligation to keep such information confidential; and (d) information independently developed by the receiving party's employees or agents provided that the receiving party can show that those same employees or agents had no access to the Confidential Information received hereunder and evidence that the information was independently developed. Contractor may not during the Term, or for a period of five (5) years after termination of this Agreement, disclose, except in accordance with this Agreement, and except that trade secrets and information related thereto may not be disclosed at any time, any Confidential Information received pursuant to or in connection with this Agreement, and may not during the Term or any time thereafter utilize such Confidential Information for Contractor's own or a third party's benefit. However, disclosure may be made to the extent required by law, a

4

court or a governmental entity provided Contractor (where permitted by law) has promptly notified Newtek prior to such disclosure to allow Newtek to challenge such disclosure.

       d.     Regarding all Confidential Information, Contractor will: (i) hold in strict confidence and maintain the secrecy of the Confidential Information; (ii) use due diligence to prevent the disclosure of the Confidential Information to any third party; (iii) disclose Confidential Information only to those of its directors, employees, accountants, investors, advisors, and agents who need to know such Confidential Information, who have been informed of the confidential nature of such information and who agree to abide by the terms of this Agreement; (iv) not use the Confidential Information, directly or indirectly, for any purpose not specifically contemplated by this Agreement; and (v) upon the request of Newtek promptly return or destroy all tangible Confidential Information in Contractor's custody or control, provided that certain Confidential Information may be retained if required by law or if necessary for audit purposes or the owner of such Confidential Information has consented to its retention.

       e.     If Contractor commits a breach, or threatens to commit a breach, of any of the provisions of this paragraph 7 or paragraph 10, Newtek, in addition to having the right to terminate this Agreement, shall have the right to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to Newtek and that money damages will not provide an adequate remedy to Newtek. In addition, Newtek may take all such other actions and remedies available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach.

       f.     The terms and conditions of this paragraph 7 shall survive any termination or expiration of this Agreement.

       8.     <u>Indemnity</u>

       Contractor will at all times indemnify and hold harmless Newtek, the Affiliated Companies and their officers, directors, shareholders, employees, successors and assigns from and against any and all third party claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, arising out of or relating to Contractor's breach of any warranty, representation, covenant or agreement made in this Agreement or Contractor's negligence in performing its duties and responsibilities pursuant to this Agreement.

       9.     <u>Enforceability</u>

       The failure of either party, at any time, to require performance by the other party of any provision hereof shall in no way affect the right of that party thereafter to enforce the same, nor shall it affect any other party's right to enforce the same, or to enforce any of the other provisions of this Agreement; nor shall the waiver by either party of the breach of any provision hereof be taken or held to be a waiver of any subsequent breach of such provision or as a waiver of the provision itself.

10.    Non Solicitation

Contractor agrees that during the Term and for a period of two (2) years thereafter, it shall not, without the prior written consent of Newtek or the Affiliated Company (whichever is the subject employee's employer), directly or indirectly, on its own behalf or in the service or on behalf of others, (a) solicit, induce or encourage any person who is then an employee of Newtek or any Affiliated Company to terminate his or her employment with Newtek or the Affiliated Company, as applicable, or (b) hire or attempt to hire any person who is or was an employee of Newtek or any Affiliated Company within the six (6) months immediately prior to the subject date. This provision shall survive termination of the Agreement.

11.    LIMITATION OF LIABILITY

NEITHER NEWTEK NOR ANY OF THE AFFILIATED COMPANIES WILL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF REVENUE, PROFITS OR DATA, ARISING IN CONNECTION WITH THIS AGREEMENT OR THE NEWTEK SERVICES, EVEN IF NEWTEK OR ANY OF THE AFFILIATED COMPANIES HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, NEWTEK'S AND THE AFFILITED COMPANIES' COLLECTIVE AGGREGATE LIABILITY ARISING WITH RESPECT TO THIS AGREEMENT AND THE NEWTEK SERVICES WILL NOT EXCEED THE AMOUNT OF COMPENSATION PAID BY NEWTEK TO THE CONTRACTOR HEREUNDER.

12.    Assignment

Neither this Agreement nor the Contractor's rights and obligations hereunder, may be assigned by Contractor.  Newtek may assign to the Affiliated Companies some or all of its rights and obligations hereunder at any time without any further consent of or notice to Contractor.

13.    Modification

This Agreement may not be orally changed, modified or amended, and no change, modification or amendment shall be effective or binding, unless in writing and signed by each of the parties to this Agreement.

14.    Severability; Survival

In the event any provision of this Agreement is found to be void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the void or unenforceable part had been severed and deleted.  The provisions of this Agreement that by their nature would survive termination of this Agreement, including without limitation paragraphs 6, 9, 10, 12 and 13 hereof shall survive the termination of this Agreement.

15.    Notice

Any notice, request, instruction or other communication to be given hereunder by either party hereto to the other shall be in writing, and delivered personally (including deliveries by

6

express, overnight courier services) or sent by certified or registered mail, postage prepaid, return receipt requested, to the address set forth for such party at the head of this Agreement. Any notice so given shall be deemed received when personally delivered or five days after mailing. Any party may change the address to which notices are to be sent by giving notice of such change of address to the other party in the manner herein provided for giving notice.

If to Newtek:

> Newtek Business Services Corp.
> 1981 Marcus Avenue, Suite 130
> Lake Success, NY 11042
> Facsimile: (212) 643-0340
> Attn: Chief Executive Officer

with a copy to:

> Newtek Business Services Corp.
> Attn: Legal Department
> 1981 Marcus Avenue, Suite 130
> Lake Success, NY 11042
> Facsimile: (212) 643-0340

If to Contractor:

> ADR Partners, LLC
> 777 East Main Street
> Westfield, IN 46074
> Attn: Kerri Agee
> Phone: (317) 663-3690
> E-Mail: Kagee@Banc-Serv.com

16. <u>Applicable Law</u>

Jurisdiction and venue for any claim or cause of action arising under this Agreement shall be exclusively in the federal or state courts located in the City, County and State of New York and this Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to its conflicts of laws principles.

17. <u>Press Releases</u>

Unless otherwise required by law or by a U.S. government regulatory body, neither party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other party (such approval not be unreasonably withheld or delayed), except that the execution of this Agreement may be publicly announced.

7

18.     Counterparts

This Agreement may be executed in one or more counterparts, each of which, when taken together, shall be deemed an original and each of which may be introduced as evidence or used for any other purpose without the production of its duplicate counterparts.

19.     Third Party Beneficiaries

The Affiliated Companies shall be deemed to be third party beneficiaries under this Agreement.

20.     Entire Agreement

This Agreement including Schedule A represents the entire agreement among the parties with respect to the subject matter hereof, and all prior agreements or understandings relating to the services of Contractor, written or oral, are nullified and superseded hereby.

22.     Headings

The headings contained in this Agreement are for reference purposes only, and shall not affect the meaning or interpretation of this Agreement.

*Signatures on Next Page*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**NEWTEK BUSINESS SERVICES CORP.**

By: _____

Name:   Barry Sloane

Title:   Chairman, President and CEO

**ADR PARTNERS, LLC**

By: _____

Name: Kerri L. Agee

Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**NEWTEK BUSINESS SERVICES CORP.**


By: _____
Name: _____
Title: _____


**ADR PARTNERS, LLC**


By: _____
Name:  Kerri L. Agee
Title:   President

**Schedule A**

A quality referral is defined as an opportunity presented through NewTracker ™ for one or more services whereby the Contractor has had direct conversation with the submitted contact person listed on the referral and the contact person is expecting to receive communication directly from Newtek regarding the referred services(s).

| Newtek Service Offering | Description | Referral Commission | Timing of Fee Payments |
|---|---|---|---|
| Commercial Business Loans (SBA 7(a) Loans)* | Commercial Business Loans (SBA 7(a) Loans)* | 150 basis points of the funded loan amount for each referral under this agreement.** | Within 30 days following the month end for all loans in the previous month. |
| Commercial Business Loans (SBA 504 Loans)* | Commercial Business Loans (SBA 7(a) Loans)* | Fifteen percent (15%) of gross fees received by Newtek in connection with the origination. | Within 30 days following the month end for all loans in the previous month. |

\*         The client relationship established by Newtek or the Affiliated Companies shall be the sole property of such company with respect to the Newtek Services and Contractor shall have no rights therein whether during or subsequent to the Term other than with respect to the compensation specified herein.

\*\*        Such 150 basis points shall be paid only on new loan transactions.

**Schedule B**
(list of existing customers)

| Customer ID | Customer Name |
|---|---|
| 001 | Plattsmouth State Bank |
| 002 | Bank of Indiana |
| 003 | Home National Bank |
| 004 | Heartland/Horizon Community Bank |
| 005 | Legacy Bank |
| 006 | Legence Bank |
| 007 | MainSource Bank |
| 008 | The Leaders Bank |
| 009 | Centre Bank |
| 010 | First National Bank |
| 011 | IAB Financial Bank |
| 012 | Jackson County Bank |
| 013 | Ossian State Bank |
| 014 | BloomBank |
| 015 | North Salem State Bank |
| 016 | First American Bank |
| 017 | Salin Bank & Trust |
| 018 | MidWest One Bank |
| 019 | Monroe Bank |
| 020 | West Bank of Iowa |
| 021 | Delaware Place Bank |
| 022 | First Federal Savings Bank |
| 023 | Central Bank |
| 024 | Premier Bank |
| 025 | Logansport Savings Bank |
| 026 | Great Western Bank |
| 027 | Hoosier Heartland |
| 028 | State Bank of Lizton |
| 029 | Home Bank |
| 030 | Community & Southern Bank |
| 031 | Community First Bank of Indiana |
| 032 | Kerndt Brothers Savings Bank |
| 033 | Elberfeld State Bank |
| 034 | The Harvard State Bank |
| 035 | Markle Bank |
| 036 | Hendricks County Bank & Trust Company |
| 037 | The Napoleon State Bank |
| 038 | Devon Bank |
| 039 | BBB Funding |
| 040 | Merchants Bank of Indiana |
| 041 | Bank of Iowa |
| 042 | Midwest America FCU |
| 043 | Riddell National Bank |
| 044 | The Home Savings and Loan Company |
| 045 | Crossroads Bank |
| 046 | Tri-County Bank & Trust Co |
| 047 | NXT Bank |
| 048 | First Bank Richmond |
| 049 | VisionBank of Iowa |
| 050 | Foundation Bank |

11

| | |
|---|---|
| 051 | City State Bank |
| 052 | Jefferson Federal Bank |
| 053 | Stonegate Bank |
| 054 | Community State Bank |
| 055 | Bippus State Bank |
| 056 | First Merchants Bank |
| 057 | First State Bank |
| 058 | West End Bank |
| 059 | Sauk Valley Bank |
| 060 | Seaway Bank and Trust Company |
| 061 | Pilot Bank |
| 062 | Farmers State Bank |
| 063 | Insight Bank |
| 064 | Northbrook Bank & Trust |
| 065 | Mutual Savings Bank |
| 066 | First Community Financial Bank |
| 067 | Providence Bank |
| 068 | Lafayette Community Bank |
| 069 | Farmers & Merchants Bank |
| 070 | Central State Bank |
| 071 | First National Bank of Ames |
| 072 | Farmers State Bank |
| 073 | Freedom Bank |
| 074 | American Trust Federal Savings |
| 075 | Alliance Bank |
| 076 | Flagship Bank |
| 077 | Achieva Credit Union |
| 078 | PrimeTrust Federal Credit Union |
| 079 | Titan Bank N.A. |
| 080 | Green Belt Bank & Trust |
| 081 | First Federal Savings Bank of Iowa |
| 082 | First Farmers Bank & Trust |
| 083 | First Financial Bank NA |
| 084 | German American Bancorp |
| 085 | The Peoples Bank |
| 086 | Heritage Bank |
| 087 | Springs Valley Bank & Trust |
| 088 | Merchants and Manufacturers Bank |
| 089 | Insignia Bank |
| 090 | Centier Bank |
| 091 | First Federal Community Bank |
| 092 | Citizens State Bank |
| 093 | First Harrison Bank |
| 094 | First Midwest Bank |
| 095 | CRF Small Business Loan Company, LLC |
| 096 | Cole Taylor Bank |
| 097 | Richwood Banking Company |
| 098 | The Farmers National Bank of Canfield |
| 099 | Benchmark Bank |
| 100 | First Minnetonka City Bank |
| 101 | First Independence Bank |
| 102 | Middlefield Banking Company |
| 103 | Liberty Bank - OH |
| 104 | Preferred Community Bank |

| | |
|---|---|
| 105 | Mutual Federal Savings Bank |
| 106 | Washington State Bank |
| 107 | Bank of Geneva |
| 108 | Greenfield Banking Company |
| 109 | Veridian Credit Union |
| 110 | Central State Bank |
| 1100 | First Community Bank of Homer |
| 1101 | Seaway Bank and Trust Company |
| 111 | First Natl Bank of Wyoming |
| 112 | Capital Springs |
| 113 | First Business Bank-Madison |
| 114 | First Business Bank-Milwaukee |
| 115 | OSB Community Bank |
| 116 | Cecil Bank |
| 117 | Gulfstream Business Bank |
| 118 | American National Bank |
| 119 | Fahey Bank |
| 120 | Providence Bank (GA) |
| 1200 | IAB Financial |
| 121 | First Federal Savings Bank-NC |
| 122 | First Community Bank of Joliet |
| 123 | Mountain Valley Bank |
| 124 | Security Federal Savings Bank |
| 125 | First State Bank - OH |
| 126 | BankIowa - #126 |
| 127 | First Internet Bank |
| 128 | Lake National Bank |
| 130 | First Savings Bank - IN |
| 131 | Celtic Bank |
| 132 | Wayne Bank & Trust |
| 133 | Bradford National Bank |
| 134 | Sperry Credit Union |
| 136 | Liberty National Bank |
| 137 | RiverWind Bank |
| 138 | The Bank of Commerce |
| 139 | Ameriana Bank and Trust, S.B. |
| 141 | American Community Bank & Trust |
| 142 | Finance Fund Capital Corporation |
| 143 | Growth Capital Corp |
| 144 | Alamerica Bank |
| 145 | Southern States Bank |
| 146 | Evansville Teachers FCU |
| 147 | First State Bank - MI |
| 148 | First Partners Bank |
| 149 | Resolute Bank |
| 150 | Pinnacle Bank (TN) |
| 1500 | Bank Financial |
| 151 | KeyBank, NA |
| 152 | Pinnacle Bank (AZ) |
| 153 | Ohnward Bank & Trust |
| 154 | Northeast Bank |
| 155 | Grand Ridge National Bank |
| 156 | New Horizon Bank |
| 157 | Bank34 |

| | |
|---|---|
| 158 | Pulaski Bank |
| 159 | Bankwell Bank |
| 160 | Fairview State Banking Company |
| 161 | Citizens Bank of DeGraf |
| 162 | EVB Bank |
| 163 | CEI 7(a) Financing |
| 164 | Georgia Banking Company |
| 165 | California Credit Union |
| 166 | Empire State Bank |
| 167 | Civic Bank & Trust |
| 168 | Guadalupe National Bank |
| 169 | Broward Bank of Commerce |
| 171 | Florida Capital Bank, NA |
| 172 | CBC National Bank |
| 173 | Enterprise Bank and Trust |
| 174 | Commercial Savings Bank |
| 175 | First Dakota National Bank |
| 176 | Ackley State Bank |
| 177 | Evergreen Business Capital |
| 178 | Spirit of Texas Bank |
| 179 | Floridian Community Bank |
| 180 | Suncrest Bank |
| 181 | Essex Bank |
| 182 | NexBank SSB |
| 183 | Countryside Bank |
| 184 | Mainland Bank |
| 185 | Settlers bank |
| 186 | First Trust & Savings Bank |
| 187 | State Bank of Lincoln |
| 188 | Village Bank |
| 189 | Professional Bank |
| 190 | Third Coast Bank |
| 191 | Beach Community Bank |
| 192 | City National Bank Florida |
| 193 | Paragon Bank |
| 194 | The Union Bank Company |
| 195 | The Rockhold, Brown & Co. Bank |
| 197 | CF Bank |
| 198 | Entegra Bank |
| 199 | Mid America Bank |
| 200 | Two Rivers Bank and Trust |
| 200a | Two Rivers Bank & Trust |
| 201 | Meade County Bank |
| 202 | The Mint National Bank |
| 203 | Interra Credit Union |
| 204 | Icon Bank of Texas |
| 205 | Machias Savings Bank |
| 206 | Cornerstone Bank |
| 206a | CornerStone Bank |
| 207 | People's Bank of Seneca |
| 208 | Civis Capital |
| 209 | Columbus First Bank |
| 210 | CyFair FCU |
| 211 | Allied First Bank |

14

| | |
|---|---|
| 212 | Commercial Bank of Texas |
| 213 | Flagship Enterprise Center |
| 214 | The Old Fort Banking Company |
| 215 | First Tennessee Bank NA |
| 216 | United Community bank |
| 217 | [Deleted] |
| 218 | Pinnacle Bank - TX |
| 219 | Texas Gulf Bank |
| 220 | Gulf Coast Renaissance Corporation |
| 221 | Peoples Exchange Bank |
| 222 | Newton Federal Bank |
| 223 | Lone Star Bank |
| 224 | Clearpath FCU |
| 2240 | Finance Fund of OH |
| 225 | Bay Colony Development Corp. |
| 226 | State Bank of Table Rock |
| 227 | Sunnyside Federal Savings & Loan Assoc |
| 228 | Regional Business Assistance  Corporati |
| 229 | National Capital Investment Fund |
| 230 | Metropolitan Bank |
| 2301 | Republic BankAZ, NA |
| 231 | Bank of North Carolina |
| 232 | Allegiance Bank |
| 233 | Xceed Financial Credit Union |
| 234 | UCEDC |
| 235 | Schertz Bank and Trust |
| 236 | Florida Business Development Corp. |
| 237 | Fidelity Bank of Florida |
| 238 | Community Ventures |
| 239 | The Claxton Bank |
| 240 | Coasthills Credit Union |
| 240a | Coast Hills Credit Union |
| 241 | The Peoples State Bank |
| 242 | California Statewide CDC |
| 243 | R Bank |
| 244 | Cross River Bank |
| 245 | Geauga Savings |
| 300 | Technology Credit Union |
| 301 | MidCoast Community Bank |
| 302 | Banc of California |
| 304 | Citizens First Bank |
| 305 | US AmeriBank |
| 308 | Illini Bank |
| 315 | Wallis State Bank |
| 321 | The Rockhold Brown & Company Bank |
| 322 | Third Coast Bank |
| 323 | The State Bank & trust Company |
| 325 | Horizon Community Bank |
| 327 | Gulf Coast Renaissance Corp |
| 329 | Sunnyside Federal S&L |
| 330 | Evolve Bank |
| 337 | California Credit Union |
| 340 | Community Ventures - KY |
| 341 | RBAC |

15

| | |
|---|---|
| 345 | Trans-Pacific National Bank |
| 347 | Centier Bank |
| 350 | Armstrong Bank |
| 351 | telhio Credit Union |
| 354 | Timberland Bank |
| 355 | Bank First National |
| 356 | Westside State Bank |
| 358 | C1 Bank |
| 361 | Pacific Mercantile Bank |
| 363 | Westside State Bank |
| 364 | Blackhawk Bank |
| 367 | First National Bank of Pandora |
| 368 | The Business Bank of St Louis |
| 369 | Hancock Bank |
| 370 | Lincoln Savings Bank |
| 371 | Commerce State Bank |
| 372 | First Home Bank |
| 373 | Mutual of Omaha Bank |
| 374 | Dallas Capital Bank |
| 375 | Southstar Bank |
| 376 | Berkshire Bank |
| 377 | Elements Credit Union |
| 379 | AimBank |
| 501 | Bay Cities Bank |
| 503 | M & T Bank |
| 504 | 5Th Gear Consulting |
| 508 | Florence Savings Bank |
| 509 | Landmark Community Bank |



Hamilton Superior Court 1

29D01-1807-PL-006948

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

```
2018034302  LIEN              $25.00
07/27/2018 11:28:18A 2 PGS
Jennifer Hayden
HAMILTON County Recorder IN
Recorded as Presented
```

## NOTICE OF INTENTION OF CORPORATE EMPLOYEE TO HOLD LIEN OVER CORPORATE PROPERTY AND CORPORATE EARNINGS PURSUANT TO IND. CODE §32-28-12-1, *et seq.*

To:   Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE  19808

      Corporation Service Company
      135 North Pennsylvania Street, Suite 1610
      Indianapolis, IN 46204

1. **NOTICE IS HEREBY GIVEN** that Kerri L. Agee, a former corporate employee of ADR Partners, LLC d/b/a banc-serv Partners, LLC and a/k/a banc-serv plus, intends to hold and does hold a Corporate Employee's Lien, pursuant to Indiana Code § 32-28-12-1 *et seq.*, to secure the payment of sums due and owing to her by virtue of her employment as follows:

   1.   The amount of the employee's claim is:

        $1,000,000.00, plus attorney's fees and costs

   2.   The date of the employee's employment is:

        June 24, 2016

   3.   The name of the corporation subject to this lien is:

        ADR Partners, LLC d/b/a banc-serv Partners, LLC and a/k/a banc-serv plus



Kerri L. Agee

EXHIBIT

3

Page 1 of 2

STATE OF ~~INDIANA~~ *Colorado*                  )
COUNTY OF ~~San Miguel~~                          )ss:

      Before me, a Notary Public in and for said County and State, personally appeared Kerri L. Agee who acknowledged the execution of the foregoing Notice Of Intention Of Corporate Employee To Hold Lien Over Corporate Property And Corporate Earnings on behalf of the above-described lien claimant as her voluntary act and deed, this _26th_ day of _July_, 2018.

Signature: _Ameliza S Weis_          County of Residence: _San Miguel_

Printed: _Ameliza S Weis_          Commission Expires: _03-10-2019_

> AMELIZA S WEIS
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20074007737
> MY COMMISSION EXPIRES MARCH 10, 2019

      I affirm, under penalties for perjury, that I have taken reasonable care to redact each Social Security number in this document, unless required by law.

_Jonathan A. Bont, Attorney at Law_

This Instrument was prepared by, and should be returned to:

Jonathan A. Bont, Attorney at Law
PAGANELLI LAW GROUP
10401 N. Meridian Street, Suite 209
Indianapolis, IN  46290
Tel:  317.550.1855
Fax:  317.569.6016
E-Mail:  jon@paganelligroup.com

29D01-1807-PL-006948
Hamilton Superior Court 1

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

| | | |
|---|---|---|
| STATE OF INDIANA | ) | HAMILTON SUPERIOR COURT |
| | )SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO.: 29D01- |

| | |
|---|---|
| KERRI L. AGEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NEWTEK BUSINESS SERVICES | ) |
| HOLDCO 5, INC, ADR PARTNERS, | ) |
| LLC d/b/a BANC-SERV | ) |
| PARTNERS, LLC, and a/k/a BANC- | ) |
| SERV PLUS, and NEWTEK | ) |
| BUSINESS SERVICES CORP. | ) |
| | ) |
| Defendants. | ) |

To Defendant: **Newtek Business Services Corp.**
**CSC-Lawyers Incorporating Service Company**
**7 St. Paul Street**
**Suite 820**
**Baltimore MD 21202**

**Barry Sloane**
**1981 Marcus Ave., Suite 130**
**Lake Success, New York 11042**

You have been sued by the person named as plaintiff and in the Court indicated above.   The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated ___7/27/2018___                          _Tammy Baitz_ (Seal)
                                                 Clerk, Hamilton Superior Court

THE FOLLOWING MANNER OF SERVICE OF SUMMONS IS HEREBY DESIGNATED:
__XX__ Registered or **certified mail**.
_____ Service at place of employment, to-wit:
_____ Service on individual (Personal or copy) at above address.
_____ Service on agent. (Specify):
_____ Other service. (Specify):_____

PLAINTIFF'S COUNSEL:                          COURT ADDRESS:
Jonathan A. Bont                              Clerk of the Hamilton County Superior Court

HAMILTON CIRCUIT COURT
SEAL
INDIANA

10401 N. Meridian St., Suite 450          1 Hamilton County Square, Suite 313
Indianapolis, IN 46290                    Noblesville, IN 46060
317-550-1855

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ___ day of _____, 20___:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant,_____.

(2) By leaving a copy of the Summons and a copy of the complaint at _____
which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3)  Other Service or Remarks:_____

_____

_____          _____
Sheriff's Costs                                                                Sheriff

                                               By:    _____
                                                        Deputy

## CLERK'S CERTIFICATE OF MAILING

          I hereby certify that on the ___ day of _____, 20___, I mailed a copy of this summons
and a copy of the complaint to the defendant, _____, by certified mail, requesting a return
receipt, at the address furnished by the plaintiff.


                                                        _____
                                                        Clerk, Hamilton Superior Court

Dated:_____.                    By:    _____
                                                        Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

          I hereby certify that the attached receipt was received by me showing that the Summons and
a copy of the complaint mailed to defendant _____ was accepted by the defendant on the
day of _____, 20___.

          I hereby certify that the attached return receipt was received by me showing that the
summons and a copy of the complaint was returned not accepted on the ___ day of _____, 20___.

          I hereby certify that the attached return receipt was received by me showing that the
Summons and a copy of the complaint mailed to defendant _____ was accepted by
on behalf of said defendant on the ___ day of _____, 20___.


                                                        _____
                                                        Clerk, Hamilton Superior Court

                                               By:    _____
                                                        Deputy

Case 1:18-cv-02641-JRS-TAB   Document 1-2   Filed 08/27/18   Page 53 of 60 PageID #: 59

**29D01-1807-PL-006948**
Hamilton Superior Court 1

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# S U M M O N S

STATE OF INDIANA ) HAMILTON SUPERIOR COURT
)SS:
COUNTY OF HAMILTON ) CAUSE NO.: 29D01-

KERRI L. AGEE, )
)
    Plaintiff, )
)
    v. )
)
NEWTEK BUSINESS SERVICES )
HOLDCO 5, INC, ADR PARTNERS, )
LLC d/b/a BANC-SERV )
PARTNERS, LLC, and a/k/a BANC- )
SERV PLUS, and NEWTEK )
BUSINESS SERVICES CORP. )
)
    Defendants. )

To Defendant: **Newtek Business Services HoldCo 5, Inc.**
    **Barry Sloane**
    **1981 Marcus Ave., Suite 130**
    **Lake Success, New York 11042**

You have been sued by the person named as plaintiff and in the Court indicated above.  The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated _____7/27/2018_____  _____ (Seal)
    Clerk, Hamilton Superior Court

THE FOLLOWING MANNER OF SERVICE OF SUMMONS IS HEREBY DESIGNATED:
__XX__ Registered or **certified mail**.
_____ Service at place of employment, to-wit:
_____ Service on individual (Personal or copy) at above address.
_____ Service on agent. (Specify):
_____ Other service. (Specify):_____

PLAINTIFF'S COUNSEL:
Jonathan A. Bont
10401 N. Meridian St., Suite 450
Indianapolis, IN 46290
317-550-1855

COURT ADDRESS:
Clerk of the Hamilton County Superior Court
1 Hamilton County Square, Suite 313
Noblesville, IN 46060

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ___ day of _____, 20___:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____.

(2) By leaving a copy of the Summons and a copy of the complaint at _____
which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3)  Other Service or Remarks: _____

_____

_____         _____
Sheriff's Costs                                                          Sheriff

                                            By:    _____
                                                         Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ___ day of _____, 20___, I mailed a copy of this summons and a copy of the complaint to the defendant, _____, by certified mail, requesting a return receipt, at the address furnished by the plaintiff.

                                            _____
                                            Clerk, Hamilton Superior Court

Dated: _____.                    By:    _____
                                                         Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the day of _____, 20___.

I hereby certify that the attached return receipt was received by me showing that the summons and a copy of the complaint was returned not accepted on the ___ day of _____, 20___.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by on behalf of said defendant on the ___ day of _____, 20___.

                                            _____
                                            Clerk, Hamilton Superior Court

                                            By:    _____
                                                         Deputy

29D01-1807-PL-006948

Hamilton Superior Court 1

Filed: 7/27/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# S U M M O N S

| | | |
|---|---|---|
| STATE OF INDIANA | ) | HAMILTON SUPERIOR COURT |
| | )SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO.: 29D01- |

|  |  |
|---|---|
| KERRI L. AGEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NEWTEK BUSINESS SERVICES | ) |
| HOLDCO 5, INC, ADR PARTNERS, | ) |
| LLC d/b/a BANC-SERV | ) |
| PARTNERS, LLC, and a/k/a BANC- | ) |
| SERV PLUS, and NEWTEK | ) |
| BUSINESS SERVICES CORP. | ) |
| | ) |
| Defendants. | ) |

To Defendant: **ADR Partners, LLC**
**Corporate Service Company**
**251 Little Falls Drive**
**Wilmington, DE 19808**

You have been sued by the person named as plaintiff and in the Court indicated above.   The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated ____7/27/2018____

_____ (Seal)
Clerk, Hamilton Superior Court

THE FOLLOWING MANNER OF SERVICE OF SUMMONS IS HEREBY DESIGNATED:

_XX_ Registered or **certified mail**.
_____ Service at place of employment, to-wit:
_____ Service on individual (Personal or copy) at above address.
_____ Service on agent. (Specify):
_____ Other service. (Specify):_____

PLAINTIFF'S COUNSEL:
Jonathan A. Bont
10401 N. Meridian St., Suite 450
Indianapolis, IN 46290
317-550-1855

COURT ADDRESS:
Clerk of the Hamilton County Superior Court
1 Hamilton County Square, Suite 313
Noblesville, IN 46060

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ___ day of _____, 20___:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant,_____.

(2) By leaving a copy of the Summons and a copy of the complaint at _____
which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3)  Other Service or Remarks:_____

_____

_____     _____
Sheriff's Costs                                                              Sheriff

                                                    By:   _____
                                                          Deputy

## CLERK'S CERTIFICATE OF MAILING

        I hereby certify that on the ___ day of _____, 20___, I mailed a copy of this summons
and a copy of the complaint to the defendant, _____, by certified mail, requesting a return
receipt, at the address furnished by the plaintiff.


                                                    _____
                                                    Clerk, Hamilton Superior Court

Dated:_____.                     By:   _____
                                                    Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

        I hereby certify that the attached receipt was received by me showing that the Summons and
a copy of the complaint mailed to defendant _____ was accepted by the defendant on the
day of _____, 20___.

        I hereby certify that the attached return receipt was received by me showing that the
summons and a copy of the complaint was returned not accepted on the ___ day of _____, 20___.

        I hereby certify that the attached return receipt was received by me showing that the
Summons and a copy of the complaint mailed to defendant _____ was accepted by
on behalf of said defendant on the ___ day of _____, 20___.


                                                    _____
                                                    Clerk, Hamilton Superior Court

                                                    By:   _____
                                                          Deputy

**29D01-1807-PL-006948**
Hamilton Superior Court 1

Filed: 7/23/2018 2:24 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | HAMILTON SUPERIOR COURT |
| | )SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO.: 29D01 |

| | |
|---|---|
| KERRI L. AGEE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NEWTEK BUSINESS SERVICES | ) |
| HOLDCO 5, INC, ADR PARTNERS, | ) |
| LLC d/b/a BANC-SERV | ) |
| PARTNERS, LLC, and a/k/a BANC- | ) |
| SERV PLUS, and NEWTEK | ) |
| BUSINESS SERVICES CORP. | ) |
| | ) |
|     Defendants. | ) |

## E-FILING APPEARANCE BY ATTORNEYS IN CIVIL CASE

1.    The party on whose behalf this form is being filed is:
Initiating  X      Responding      Intervening  ; and

the undersigned attorney and all attorneys listed on this form now appear in this case for the following parties:

    Name of parties:   Kerri L. Agee

2.    Attorney information for service as required by Trial Rule 5(B)(2)

Name(s):   Jonathan A. Bont           Attorney No. 28476-49

Address:     PAGANELLI LAW GROUP
              10401 N. Meridian St., Suite 450    Phone: 317.550.1855
              Indianapolis, IN 46290          Fax:   317.569.6016

E-Mail(s):   Jon@paganelligroup.com

**IMPORTANT**: Each attorney specified on this appearance:
(a)    certifies that the contact information listed for him/her on the

Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;

(b)     **acknowledges that all orders, opinions, and notices from the court in this matter that are served under Trial Rule 86(G) will be sent to the attorney at the email address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney**; and

(c)     understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3.      This is a **PL** case type as defined in administrative Rule 8(B)(3).

4.      This case involves child support issues. Yes ☐ No ☒ *(If yes, supply social security numbers for all family members on a separately attached document filed as confidential information on **light green paper**.  Use Form TCM-TR3.1-4.)*

5.      This case involves a protection from abuse order, a workplace violence restraining order, or a no – contact order.  Yes ☐ No ☒ *(If Yes, the initiating party must provide an address for the purpose of legal service but that address should not be one that exposes the whereabouts of a petitioner.)*  The party shall use the following address for purposes of legal service:

_____     Attorney's address

_____     The Attorney General Confidentiality program address (contact the Attorney General at 1-800-321-1907 or e-mail address is **confidential@atg.in.gov**).

_____     Another address (provide)

_____

This case involves a petition for involuntary commitment.  Yes ☐          No ☒

6.      If Yes above, provide the following regarding the individual subject to the petition for involuntary commitment:

a.  Name of the individual subject to the petition for involuntary commitment if it is not already provided in #1 above:
_____

2

b.  State of Residence of person subject to petition: _____

c.  At least one of the following pieces of identifying information:
    (i)  Date of Birth _____
    (ii)  Driver's License Number _____

        State where issued _____ Expiration date _____

    (iii)  State ID number _____

        State where issued _____ Expiration date _____

    (iv)  FBI number _____

    (v)  Indiana Department of Corrections Number _____

    (vi)  Social Security Number is available and is being provided in an attached confidential document Yes _____ No _____

7.  There are related cases: Yes ☐ No ☒ *(If yes, list on continuation page.)*

8.  Additional information required by local rule:  N/A

9.  There are other party members: Yes ☐ No ☒ *(If yes, list on continuation page.)*

Respectfully submitted,

*/s/ Jonathan A. Bont* _____
Jonathan A. Bont.     (28476-49)
Attorney Information Shown Above

*Counsel for Plaintiff, Kerri Agee*

3

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 27, 2018, I electronically filed the foregoing document using the Indiana EFiling System (IEFS).


*/s/ Jonathan A. Bont*
Jonathan A. Bont