UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KERRI L. AGEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEWTEK BUSINESS SERVICES HOLDCO | ) | Case No. 1:18-cv-02641-WTL-TAB |
| 5, INC., ADR PARTNERS, LLC d/b/a BANC- | ) | |
| SERV PARTNERS, LLC and a/k/a BANC- | ) | |
| SERV PLUS, and NEWTEK BUSINESS | ) | |
| SERVICES CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants Newtek Business Services Holdco 5, Inc. ("Holdco"), ADR Partners, LLC

d/b/a banc-serv Partners, LLC ("banc-serv"), and Newtek Business Services Corp. ("Newtek"),

respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule

of Civil Procedure 12(b)(6), to dismiss the Complaint in this action for failure to state a claim

upon which relief can be granted.

## BACKGROUND

### I.     The Defendant Companies

#### A.     Newtek Business Services Corp.

Newtek is a Maryland corporation with principal offices in New York.  Newtek is a

publicly traded internally managed, non-diversified, closed-end management investment

company that has elected to be regulated as a business development company under the

Investment Company Act of 1940.  Newtek's business includes investments in subsidiary and

portfolio companies that provide a wide range of business services and financial products to

small-and-medium sized business, including (as relevant here) U.S. Small Business

Administration ("SBA") business lending, third-party loan servicing for SBA loans, and outsourced lender service provider solutions for banks and other lenders providing SBA loans.

### B.      Newtek Business Services Holdco 5, Inc.

Holdco is a New York corporation with principal offices in New York.  Originally formed on or about June 16, 2016, under the name Banc-Serv Acquisition, Inc., Holdco is a wholly owned subsidiary of Newtek.

### C.      ADR Partners, LLC d/b/a banc-serv Partners, LLC

Banc-serv is a Delaware limited liability company with offices in Westfield, Indiana. Originally formed by Plaintiff on or about October 16, 2002, banc-serv was wholly owned by Plaintiff until June 24, 2016, when banc-serv was acquired by Holdco.  Banc-serv's sole member is Newtek LSP Holdco, LLC ("LSP Holdco"), a New York limited liability company whose two members are (i) Holdco and (ii) Wilshire Holdings 1, Inc. ("Wilshire Holdings"), a New York corporation with principal offices in New York and a wholly owned subsidiary of Newtek.

Banc-serv's business includes acting as a lender service provider to banks and other lenders, assisting in the origination and servicing of SBA loans.  Banc-serv's services for its clients include credit analysis, structuring and eligibility, packaging and closing compliance to secondary market management, due diligence, auditing, portfolio compliance and servicing, and special assets management.

## II.   Banc-serv is Acquired by Holdco and Enters into Employment Agreement with Plaintiff[1]

On or about June 24, 2016, Holdco purchased Plaintiff's 100% ownership of the membership interests in banc-serv for $5,400,000 (the "Acquisition").  On the same date,

---

[1]  The information set forth in Sections II-VI below is offered for background illustrative purposes and is not the foundation of any argument addressing the sufficiency of Plaintiff's pleadings.

banc-serv and Plaintiff entered into an employment agreement (the "Employment Agreement") in which banc-serv agreed to continue to employ Plaintiff as its President and Chief Executive Officer (positions she had held since banc-serv's inception) for a period of two years.  The Employment Agreement, which was amended on November 15, 2016, is governed by New York law.  (Employment Agreement, Compl., Exh. 1 ¶ 16.)

The Employment Agreement provided, among other things, that Plaintiff's employment by banc-serv could be terminated with or without "Just Cause," which was defined as:

> the [Plaintiff's] willful misconduct, breach of fiduciary duty involving personal profit, failure to perform stated duties in a manner consistent with Board approval following notice thereof, conviction of a felony, or material breach of any provision of this Agreement.

(Compl., Exh. 1 ¶ 1(h).)  In the event of a termination for Just Cause, "[t]he [Plaintiff] shall have no right to receive compensation or other benefits for any period after termination for Just Cause."  (Compl., Exh. 1 ¶ 11(a).)

On April 9, 2018, as discussed below, Plaintiff was terminated for "Just Cause" due to willful misconduct, breach of fiduciary duty involving personal profit, and failure to perform stated duties.

### III. The FBI Raids Banc-serv and Commences a Criminal Investigation of Plaintiff and Banc-serv

On October 12, 2017, the Federal Bureau of Investigation ("FBI"), pursuant to a federal search warrant (the "Search Warrant"), conducted a raid at banc-serv's offices in Westfield, Indiana, and removed boxes of documents and electronic data from banc-serv servers and computers.  The FBI's execution of the Search Warrant related to a criminal investigation ("Criminal Investigation") being conducted by the U.S. Department of Justice (DOJ), the Federal Deposit Insurance Corp. (FDIC) and the Office of the Inspector General of the SBA (OIG) of

Plaintiff's conduct of banc-serv's business activities prior to the Acquisition, when banc-serv was under Plaintiff's sole ownership and control.

As a result of the FBI raid[2] and execution of the Search Warrant, it was necessary for Defendants to retain counsel in connection with the Criminal Investigation, which is ongoing. As of the date hereof, Defendants have incurred approximately $675,000 in legal fees and expenses in connection with the Criminal Investigation of banc-serv's conduct during Plaintiff's ownership, which investigation is ongoing.

Moreover, banc-serv's business, name, reputation and goodwill have been materially damaged as a result of Plaintiff's pre-Acquisition conduct.  For example, Newtek has been required to write-down the fair value of its original $5.4 million investment in banc-serv to $1.4 million.  (See Newtek Form 10-K for the year ended December 31, 2017; Form 10-Q for period ended March 31, 2018 and Form 10-Q for period ended June 30, 2018.)

## IV.   Defendants Uncover Plaintiff's Pre-Acquisition Business Practices in Violation of Applicable Law

As a result of the Criminal Investigation, Defendants were required to retain outside counsel to commence an internal investigation into Plaintiff's pre-Acquisition business practices. The Criminal Investigation and the investigation conducted by Defendants have uncovered to-date substantial pre-Acquisition breaches of fiduciary duty to banc-serv by Plaintiff, as well as wrongdoing and fraud by Plaintiff in her operation of banc-serv's business, and a multitude of breaches of the representations Plaintiff made to induce Holdco to acquire her interests in banc-serv.[3]

---

[2]  The FBI raid was televised by local television stations and reported in local and national news outlets.

[3]  Separate claims have been filed against Plaintiff in an arbitration proceeding as required by the terms of the agreement governing the Acquisition.

V.   **Plaintiff Breached Her Fiduciary Duties to Banc-serv and Willfully Failed to Follow the Direction of Banc-serv's Board of Managers**

In connection with the investigation into Plaintiff's undisclosed pre-Acquisition wrongdoing, it has been discovered that Plaintiff's willful misconduct continued during her post-Acquisition employment, constituting breaches of her fiduciary duties to banc-serv and resulting in significant monetary damages and liabilities to banc-serv during the term of the Employment Agreement.

A.   **Plaintiff Commingled and Expended Funds Belonging to Banc-serv's Clients**

Unbeknownst to Defendants, both prior to and following the Acquisition, Plaintiff caused banc-serv to comingle its operating funds with the funds of its servicing clients.  Specifically, when banc-serv was servicing federally guaranteed SBA loans for its financial institution customers, it was required to collect principal and interest payments on the loans and remit the payments at specified times to both the lenders and, if the guaranteed portions of the loans were sold in the secondary market, the pro-rated portions of the principal and interest payments to the SBA's Fiscal and Transfer Agent, Colson Services Corp.  It was recently discovered, however, that since as early as 2004, Plaintiff was causing banc-serv to commingle funds received on behalf of its lender clients and the SBA into its own operating account and utilized such funds to keep banc-serv afloat, and further, to mislead Defendants as to banc-serv's liquidity and cash position and to fund Plaintiff's lavish life-style.

Defendants recently learned that banc-serv employees notified Plaintiff of their concerns with respect to this practice and the shortfall in banc-serv's servicing account, both prior to and after the Acquisition, yet Plaintiff did not disclose this fact to banc-serv's Board of Managers (the "Board") or put an end to the commingling of client funds, which continued during the term of the Employment Agreement.  This wrongful conversion of client funds has resulted in

monetary damages to banc-serv in the form of a significant shortfall in banc-serv's servicing account, which shortfall is estimated to reach approximately $750,000 once the reconciliation is complete—funds that were to be held and maintained solely for the benefit of banc-serv's clients and the SBA.

In order to protect banc-serv's customers and the integrity of the federally guaranteed SBA loan program, Newtek has been required to advance capital and other funds to banc-serv to restore funds converted by, or at the direction of, Plaintiff, to make sure all of banc-serv's customers and secondary market participants are made whole.

The foregoing conduct by Plaintiff was a clear violation of her fiduciary duty to banc-serv.

**B.     Plaintiff Caused Banc-serv to Incur Personal Expenses for Her Family Members**

In addition, undisclosed to Defendants, Plaintiff caused banc-serv to finance certain car leases for her family members, which financing contracts have since matured, resulting in additional post-Acquisition moneys owed by banc-serv in excess of $13,035.  Plaintiff also caused banc-serv to pay the personal expenses of her brother-in-law, which personal expenses are estimated to have exceeded $50,000.  These acts, which amounted to, among other things, corporate waste, were further breaches of the fiduciary duties Plaintiff owed to banc-serv.

**C.     Plaintiff Assisted Her Family and Friends in Obtaining SBA Loans**

The Criminal Investigation has brought to light that Plaintiff assisted both her family members and friends to obtain over $1,000,000 in SBA loans from banks with which Plaintiff had dealings.  On information and belief, several of these loans are under both criminal and civil investigations by government agencies and have exposed banc-serv to millions of dollars in potential post-Acquisition liabilities, including one loan that was defaulted on by the family of

Ms. Agee's long-time friend and former banc-serv Chief Operating Officer Kelly Isley in an amount in excess of $1,000,000. Plaintiff did not disclose these potential liabilities prior to the Acquisition or to banc-serv's Board during the term of the Employment Agreement.

**D.      Plaintiff Caused Banc-serv to Incur Liabilities in Connection with SBA Loans**

In addition to the SBA loans to Plaintiff's family and friends, Defendants have discovered several additional SBA loans overseen by Plaintiff with significant potential liabilities arising from banc-serv's failure, under Plaintiff's direction, to comply with certain of the SBA's regulations in connection with the origination, servicing, or liquidation of SBA loans. One such loan has resulted in an undisclosed, post-Acquisition liability by banc-serv of approximately $54,000, and Defendants have discovered several other loans where SBA-related liabilities could exceed $1,000,000, none of which was disclosed by Plaintiff to banc-serv's Board.

**E.      Plaintiff Caused Banc-serv to Incur Undisclosed Liabilities to a Major Customer**

Defendants recently discovered that, prior to the Acquisition, a major banc-serv customer (the "Customer") commenced a lawsuit (the "Lawsuit") against banc-serv for, among other things, defrauding a financial institution, criminal mischief, and deception, arising out of Plaintiff causing banc-serv to sell the Customer's interest in the guaranteed portion of an SBA 7(a) loan without the Customer's knowledge or consent, and intentionally and wrongfully failing to turn over the proceeds of that sale to the Customer. Plaintiff then caused banc-serv to enter into a settlement (the "Settlement") of the Lawsuit pursuant to which banc-serv agreed to waive and not charge any servicing fees to the Customer for a period of five years, through November 2019.

Plaintiff's failures to disclose the Lawsuit and the Settlement, both before and after the Acquisition, are material omissions that concealed very serious allegations against Plaintiff as to her operation of banc-serv in an illegal manner (a further breach of her fiduciary duties to banc-serv), her violation of SBA rules and regulations, and her character.  Moreover, pursuant to the terms of the undisclosed Settlement, banc-serv has been required to provide free services to the Customer.  Banc-serv estimates that it has been required to provide $43,215.73 in free services to the Customer to date, with over 12 months left under the Settlement, a liability that was not disclosed to Defendants prior to the Acquisition.

### F.    Plaintiff Failed to Perform Her Required Duties Under the Employment Agreement in a Manner Consistent with Approval of Banc-serv's Board

Beginning shortly after Plaintiff's retention as banc-serv's President and Chief Executive Officer, Plaintiff repeatedly prepared and presented to banc-serv's Board budgets and financial projections that materially inflated projected revenues and understated projected expenses.  In addition to the pre-Acquisition budgets Plaintiff presented to Defendants, Plaintiff presented her first budget to the new Board shortly after the Acquisition in July 2016.  By October 2016, however, it was clear that banc-serv's actual results were materially short of the budget as a result of variances in income and expenses.  Banc-serv's Board subsequently discovered that Plaintiff's 2016 budget did not disclose approximately $200,000 in bonuses that Plaintiff had intended to pay herself and other employees.

The Board emphasized to Plaintiff that banc-serv's material shortfalls in financial performance were attributable to Plaintiff's poor management and failure to disclose what Plaintiff termed "below the line expenses," and Plaintiff was instructed to focus on operations, procedures, proposals, and presentations.  The Chairman of the Board specifically informed Plaintiff of the Board's dissatisfaction with multiple aspects of her performance including:

8

excessive outside activities, lack of presence in the office, poor management over operations, poor oversight of staff, failure to disclose her numerous family connections with employees, failure to disclose the Settlement and the ongoing requirement to provide significant free services to the Customer, poor cash management, and poor management of relationships with major clients.

Moreover, during her term of employment, Plaintiff failed to respond to questions posed by the Chairman of the Board and refused to accept or return his phone calls and emails.  Indeed, Plaintiff ignored the direct instructions of the Board even as banc-serv continued to deliver poor financial results in 2016 and 2017 that materially diverged from Plaintiff's projections.

In December 2017, shortly after the FBI raid and commencement of the Criminal Investigation, a telephonic meeting of banc-serv's Board took place to address, among other things, the material shortfalls in banc-serv's financial performance measured against the projections and forecasts that had been provided by Plaintiff.  However, instead of being in the office managing banc-serv's affairs and assuring employees and customers that she stood behind the Company notwithstanding the Criminal Investigation and banc-serv's consistently poor financial performance, Plaintiff, under direct questioning from the Board , was forced to disclose that she had left the country and was calling into the meeting from a "weekend vacation in Germany."  Not only had Plaintiff failed to inform the Board that she would be leaving the county on vacation at this critical time, she had misstated to one member of the Board that she was out of the office because she was ill.

In early 2018, after several major clients had terminated their loan servicing contracts with banc-serv, Plaintiff ignored repeated instructions from the Chairman of the Board to hold calls with banc-serv's significant remaining clients to encourage them to stay with the Company.

After Plaintiff failed to even schedule the requested calls over thirty days after she was instructed to do so, the Board was required to assign additional resources to assist Plaintiff with making these calls and with other aspects of managing banc-serv's operations.

## VI.    Banc-serv Terminates Plaintiff for Just Cause

As a result of, among other things, the aforementioned willful misconduct by Plaintiff in breach of her Employment Agreement, on April 9, 2018, banc-serv terminated Plaintiff's employment for Just Cause.

For the reasons stated below, the Plaintiff's claims fail as a matter of law and must be dismissed.

## <u>ARGUMENT</u>

## I.    Standard of Review

In order to withstand this Rule 12(b)(6) motion, the Complaint must contain enough information to state a legally cognizable claim.  "[A] complaint stating only 'bare legal conclusions,' even under notice pleading standards, is not enough to survive a Rule 12(b)(6) motion."  <u>Norris v. Jackson Hewitt, Inc.</u>, No. 09-CV-543 WTLJMS, 2009 WL 4744286, at *1 (S.D. Ind. Dec. 8, 2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Evans v. Corinthian Colleges, Inc.</u>, No. 1:14-CV-00002-SEB, 2014 WL 2866369, at *1 (S.D. Ind. June 23, 2014).

And because the Complaint asserts causes of action based on alleged fraudulent conduct, Plaintiff must clear the additional hurdle of stating all such allegations with particularity.  Rule 9(b) requires that Plaintiff's allegations sounding in fraud must "at least plead the identity of the person engaging in the alleged fraudulent act or acts and when that act or acts occurred."  <u>Hirata Corp. v. J.B. Oxford & Co.</u>, 193 F.R.D. 589, 598 (S.D. Ind. 2000).

## II.     Plaintiff Fails to Allege a Claim Under New York Labor Law

Count I of the Complaint purports to assert a claim under Article 6 of the New York Labor Law ("N.Y. Labor Law").  Plaintiff, however, has ignored the language of the N.Y. Labor Law, which expressly precludes her claim.  Accordingly, Count I of the Complaint must be dismissed.

### A.     Plaintiff was Employed as an "Executive" Under the N.Y. Labor Law

Pursuant to the Employment Agreement, banc-serv employed Plaintiff "as an executive officer in the capacity of President and Chief Executive Officer."  (Compl., Exh. 1 pmbl.) Plaintiff was employed to "render such administrative and management services … as are customarily performed by persons situated in a similar executive capacity and consistent with the duties of a President and Chief Executive Officer."  (Compl., Exh. 1 ¶ 2.)  In her "executive capacity," Plaintiff reported directly to banc-serv's Chairman of the Board, and was required to promote banc-serv's business and carry out the "normal duties" of "an officer."  (Id.)

New York law is clear that a person in Plaintiff's position is employed in an "executive" and "managerial" capacity as those terms are used in the N.Y. Labor Law.  See, e.g., Lauria v. Heffernan, 607 F. Supp. 2d 403, 408 (E.D.N.Y. 2009) (explaining that positions of "executive vice president" and "regional sales manager" were "person[s] employed in an executive or managerial capacity" under the N.Y. Labor Law); Schuit v. Tree Line Mgmt. Corp., 847 N.Y.S.2d 580, 581 (N.Y. App. Div. 2007) (explaining that a "director of acquisitions and senior vice president" "was employed as an executive" under the N.Y. Labor Law); Rice v. Scudder Kemper Investments, Inc., No. 01 CIV 7078 (RLC), 2003 WL 21961010, at *3 (S.D.N.Y. Aug. 14, 2003) (explaining that a "general manager and chief executive officer" was a "person employed in a bona fide executive, administrative or professional capacity" under the N.Y. Labor Law).

**B.     Because Plaintiff was an "Executive," She Cannot Sate a Claim Under Labor Law §§ 191(1)(c), 198-c, or 191(3)**

First, Plaintiff alleges that she is a "commission salesman" under N.Y. Labor Law § 190(6), which she asserts permits her to state a claim for "wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment" pursuant to N.Y. Labor Law § 191(1)(c).  (Compl. ¶¶ 70-71.)  Plaintiff, however, has ignored the language of the statute, and the clear language of her Employment Agreement, which preclude her from stating such a claim.  The definition of a "commission salesman" under the Labor Law expressly excludes "an employee whose principal activity is of a supervisory, managerial, executive or administrative nature."  N.Y. Lab. Law § 190(6).  And New York's highest court has made clear that an "executive" cannot be a "commission salesman" under the N.Y. Labor Law.  Pachter v. Bernard Hodes Grp., Inc., 891 N.E.2d 279, 282 (N.Y. 2008) (explaining that Labor Law § 190(6) "explicitly exempt[s] executives").  Thus, Plaintiff was not a "commission salesman" for banc-serv and cannot assert a cause of action as a "commission salesperson" under N.Y. Labor Law § 191(1)(c).

Second, Plaintiff asserts that she may seek reimbursement of alleged expenses pursuant to N.Y. Labor Law § 198-c.  (Compl. ¶ 72.)  Plaintiff, again, has simply ignored the language of the statute and cannot assert this claim.  N.Y. Labor Law § 198-c is clear that it "shall not apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week."  N.Y. Lab. Law § 198-c(3); see also Pachter, 891 N.E.2d at 282 (explaining that Labor Law § 198-c contains "the exclusion of executives").  Plaintiff was an "executive" under the Employment Agreement whose base compensation exceeded $5,288 per week.  (Compl., Exh 1 ¶ 3.)  Moreover, it is equally clear that N.Y. Labor Law § 198-c is a criminal statute that does not provide a civil cause of action to private litigants

such as Plaintiff.  Hammell v. Banque Paribas, 780 F. Supp. 196, 201 (S.D.N.Y. 1991) (explaining that "no civil cause of action is to be implied from section 198-c of the Labor Law"). Thus, Plaintiff is expressly excluded from coverage and cannot assert a claim for relief under N.Y. Labor Law § 198-c.

Third, Plaintiff asserts that she is entitled to payment of alleged wages under N.Y. Labor Law § 191(3).  (Compl. ¶ 73.)  Yet again, Plaintiff has ignored the language of the statute, which precludes her from asserting this claim.  By its terms, N.Y. Labor Law § 191 applies to only four categories of workers:  "manual worker," "railroad worker," "commission salespersons," and "clerical or other worker."  N.Y. Lab. Law § 191(1).  Plaintiff, however, is expressly excluded from the definitions of these categories of workers.[4]  Pachter, 891 N.E.2d at 283 (explaining that "employees serving in an executive, managerial or administrative capacity do not fall under section 191 of the Labor Law").  Plaintiff is excluded from any category of worker that is covered by N.Y. Labor Law § 191 and cannot assert a claim under that statute.

**C.  Because Plaintiff Cannot State a Claim Under the N.Y. Labor Law, She Cannot Seek Remedies Under N.Y. Labor Law § 198(1-a)**

Plaintiff asserts that, if she were to prevail on her "wage claim," she would be entitled to recover attorney's fees, prejudgment interest, and liquidated damages under N.Y. Labor Law § 198(1-a).  (Compl. ¶ 74.)  However, because Plaintiff was employed in an executive and managerial capacity, she is expressly excluded from coverage under N.Y. Labor Law §§ 191 and 198-c.  New York's highest court has made clear that employees who are excluded from

---

[4] Under the statute: (i) a "manual worker" is defined as a "mechanic, workingman or laborer"; (ii) a "railroad worker" means "any person employed by an employer who operates a steam, electric or diesel surface railroad or is engaged in the sleeping car business" and expressly excludes "a person employed in an executive capacity"; (iii) a "commission salesman" cannot be an "employee whose principal activity is of a supervisory, managerial, executive or administrative nature"; and (iv) "clerical or other worker" does not include "any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of nine hundred dollars a week." N.Y. Lab. Law § 190(4)-(7).

coverage under the N.Y. Labor Law cannot seek remedies under N.Y. Labor Law § 198(1-a).

Gottlieb v. Kenneth D. Laub & Co., 626 N.E.2d 29, 32 (N.Y. 1993) (explaining that employees who are excluded from protection under the N.Y. Labor Law cannot recover attorney's fees under N.Y. Labor Law § 198(1-a)); Pachter, 891 N.E.2d at 283 (explaining that "employees serving in an executive, managerial or administrative capacity do not fall under section 191 of the Labor Law and, as a result, those individuals are not entitled to statutory attorney's fees under section 198(1–a)").

## III.    Plaintiff Fails to Allege Breach of Contract

Count II of the Complaint alleges cursorily that "banc-serv breached the Employment Agreement with [Plaintiff] by and through the actions and inactions described above."  (Compl. ¶ 79.)  While the Complaint is vague about the alleged "actions and inactions" that Plaintiff asserts constitute a breach of contract, the conduct alleged in the Complaint cannot support a breach of contract claim under the terms of the Employment Agreement.

Plaintiff alleges that her duties were "dimish[ed]" or "restrict[ed]" "to those materially inferior to and inconsistent with her prior position and duties."  (Compl. ¶¶ 43, 55.)  However, even if Plaintiff had been assigned to inferior duties (and she was not) such conduct would not constitute a breach of the Employment Agreement pursuant to its terms.  The Employment Agreement provides a list of grounds that would permit Plaintiff to resign her employment for "Good Reason," including (i) demotion or reassignment and (ii) material breach of the Employment Agreement. (Compl., Exh. 1 ¶ 1(g)(i)-(ii).)  If a demotion or reassignment under ¶ 1(g)(i) were the same thing as a material breach under ¶ 1(g)(ii), there would be no reason for those two actions to be listed as distinct and alternative grounds in the definition of "Good Reason."  And interpreting these two provisions as describing the identical conduct would have the effect of rendering a clause in a contract "superfluous or meaningless," which New York law

14

will avoid.  Marmer Bros. Const., LLC v. Midwest Steel, Inc., No. 99 CIV. 11681, 2000 WL 1341546, at *5 (S.D.N.Y. Sept. 18, 2000).   Accordingly, Plaintiff's alleged assignment to inferior duties cannot also be a material breach of the Employment Agreement.  Plaintiff has failed to allege a breach of contract, and Count II of the Complaint should be dismissed.

**IV.     Plaintiff Fails to Allege Any Basis to Pierce the Corporate Veil**

Count III of the Complaint asserts that "Newtek exercised such control over banc-serv … that banc-serv became a mere instrumentality of Newtek" and that Plaintiff should be able to hold Newtek "jointly and severally liable for any judgment against banc-serv."  (Compl. ¶¶ 83, 85.)  Plaintiff, however, cannot allege any of the elements necessary to pierce the corporate veil, and Count III of the Complaint should be dismissed.

**A.     Delaware Law Applies to a Delaware Limited Liability Company**

In analyzing veil piercing claims, the Courts of this District look to the law of the state of the company's organization.  Chapel Ridge Investments, L.L.C. v. Petland Leaseholding Co., No. 1:13-CV-00146-PPS, 2013 WL 6331095, at *2 (N.D. Ind. Dec. 4, 2013) ("When it comes to the issue of whether the corporate form should be disregarded, it seems clear that the state of incorporation has the most interest in that determination.")  Because banc-serv is a Delaware limited liability company, Plaintiff's assertion that its corporate form should be disregarded should be analyzed under Delaware law.  Garmin Wurzburg Gmbh v. Auto. Imagineering & Mfg., LLC, No. 14-cv-02006, 2016 WL 3072011, at *3 (N.D. Ind. June 1, 2016) (applying Michigan law to veil piercing claim against Michigan limited liability company).

**B.     Plaintiff Cannot Allege the Elements Necessary to Pierce the Corporate Veil**

"Persuading a Delaware court to disregard the corporate entity is a difficult task." Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999).  "Piercing the veil is limited to exceptional circumstances and requires alleging

facts which demonstrate that the entities operated as one entity resulting in injustice or unfairness." In re Simplexity, LLC, No. 14-10569(KG), 2017 WL 65069, at *9 (Bankr. D. Del. Jan. 5, 2017). The Complaint does not contain any factual allegations from which the Court could conclude that the requisite "exceptional circumstances" are present here, because none exist.

### 1.      Newtek Does Not Have the Controlling Interest in Banc-serv and Cannot be Banc-serv's Alter-Ego

As an initial matter, "[t]he alter ego theory only comes into play in piercing the corporate veil when one seeks to hold liable an individual owner who controls the company." In re Opus E., L.L.C., 480 B.R. 561, 570 (Bankr. D. Del. 2012). Plaintiff seeks to hold Newtek liable for banc-serv's acts, but Newtek is not banc-serv's "individual owner who controls the company." Rather, banc-serv's "individual owner" is its single member, LSP Holdco. (See Notice of Removal [ECF No. 1] ¶ 8; Corporate Disclosure Statement [ECF No. 3] at 1.) Yet the Complaint does not contain a single allegation about LSP Holdco. Nor does the Complaint contain any relevant allegations about Holdco or Wilshire Holdings. Plaintiff thus asks this Court to pierce the corporate veil directly from banc-serv to Newtek, without a single relevant allegation about the three distinct companies that separate them. Plaintiff alleges no basis whatsoever to hold LSP Holdco liable for banc-serv's acts, or to hold Holdco or Wilshire Holdings liable in turn. Plaintiff cannot simply ignore the distinct corporate existence of those three separate entities and leapfrog directly to Newtek. In re Opus, 480 B.R. at 570-71.[5] Plaintiff's assertion that Newtek can be liable for the acts of banc-serv fails for this reason alone.

---

[5]  In In re Opus, the Delaware Bankruptcy Court held that Delaware law precluded the Trustee from stating a cause of action to pierce the corporate veil between Opus East, LLC, a single member limited liability company, and Opus Corp., a related corporation, because Opus Corp. was not the member of Opus East, LLC. Moreover, the Trustee's

## 2.     Plaintiff Does Not Allege a Factual Basis to Pierce the Corporate Veil

To assert a claim to pierce the corporate veil, Plaintiff must allege facts that demonstrate Newtek's "complete domination and control" of banc-serv.  PR Acquisitions, LLC v. Midland Funding LLC, No. CV 2017-0465-TMR, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018). The degree of control that Plaintiff is required to show is that Newtek has such "exclusive domination and control" that banc-serv "no longer has legal or independent significance of its own."  Wallace, 752 A.2d at 1184.  Indeed, Plaintiff must allege facts demonstrating that banc-serv is "a sham and exist[s] for no other purpose than as a vehicle for fraud."  Id.

Specific facts that Delaware Courts consider when asked to disregard the corporate form include:  "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the … corporation at the time; (5) siphoning the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." In re Opus, 480 B.R. at 570.  No single factor is sufficient to justify a decision to disregard the corporate entity:  "some combination of the above is required."  Trevino v. Merscorp, Inc., 583 F. Supp. 2d 521, 529 (D. Del. 2008).  Moreover, "an overall element of injustice or unfairness must always be present, as well."  Id.

Simply put:  the Complaint contains none of the factual allegations necessary to support Plaintiff's claim.  The Complaint alleges no facts demonstrating that Newtek's "domination and control" over banc-serve is so "complete" and "exusive" that banc-serv is "a sham" with "no independent significance of its own" other than "as a vehicle for fraud."  And nowhere does—or

---

allegations of a lack of corporate formalities between Opus Corp. and Opus, LLC (the single member of Opus East, LLC) were insufficient to state a claim to pierce the veil between Opus East, LLC, and Opus Corp.

can—Plaintiff allege that "injustice or unfairness" will result unless banc-serv's individual corporate existence is disregarded.

Unable to allege any facts, Plaintiff is left to allege in conclusory fashion that Newtek "completely controlled" banc-serv, that banc-serv acted "by and through" or "at the direction and under the control" of Newtek, and that Newtek "by and through its control over banc-serv" caused banc-serv to take certain actions.  (Compl. ¶¶ 46-49, 55-59, 83, 89, 93-96.)  Alleging legal conclusions without any supporting factual basis is insufficient to meet Plaintiff's steep pleading burden to pierce the corporate veil:  "because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence."  MicroStrategy Inc. v. Acacia Research Corp., No. CIV.A. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010).

## V.    Plaintiff Fails to Allege Tortious Interference With Contract

Count IV of the Complaint alleges that Newtek "caused banc-serv to breach the Employment Agreement" and asserts a cause of action for tortious interference with contract. (Compl. ¶¶ 87-91.).  Plaintiff, however, cannot allege that Newtek induced a breach of the Employment Agreement or acted without sufficient justification, and Count IV of the Complaint should be dismissed.

The elements of a cause of action for tortious interference are:

(1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach.

Levee v. Beeching, 729 N.E.2d 215, 221 (Ind. Ct. App. 2000).  In order to state a claim, Plaintiff must allege not only that Newtek intentionally induced banc-serv to breach the Employment

Agreement, but that Newtek did so "without sufficient justification." Meridian Fin. Advisors, Ltd. v. Pence, 763 F. Supp. 2d 1046, 1062 (S.D. Ind. 2011). And Plaintiff must state "more than a mere assertion that the … conduct was unjustified." Morgan Asset Holding Corp. v. CoBank, ACB, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). Rather, the Complaint "must set forth factual allegations from which it can reasonably be inferred that the defendant's conduct was unjustified." Id. To satisfy this element of her claim, Plaintiff must allege facts showing that the alleged breach was "malicious and exclusively directed to the injury and damage of another." Winkler v. V.G. Reed & Sons, Inc., 619 N.E.2d 597, 600-01 (Ind. Ct. App. 1993), aff'd, 638 N.E.2d 1228 (1994); see also Economation, Inc. v. Automated Conveyor Sys., Inc., 694 F. Supp. 553, 562 (S.D. Ind. 1988) (defining unjustified as "disinterested malevolence"; "malicious [conduct] unmixed with any other and exclusively directed to injury and damage of another").

As demonstrated above, Plaintiff has failed to allege any facts that Newtek induced banc-serv's conduct—with respect to the Employment Agreement or otherwise—other than unsupported and conclusory assertions that Newtek "controlled," "direct[ed]," or "caused" banc-serv to take certain actions. Accordingly, the Complaint cannot allege that Newtek intentionally induced banc-serv to breach the Employment Agreement.

However, even if Plaintiff were able to allege that Newtek induced a breach of contract (and she cannot), Plaintiff's cause of action fails for the independent and sufficient reason that she does not allege that Newtek acted without justification. The Complaint contains no factual allegations from which the Court could conclude that Newtek's conduct was "malicious and exclusively directed to the injury and damage of another." Rather, Plaintiff's allegations are limited to the single, conclusory allegation that Newtek was "completely unjustified in causing banc-serv to breach the Employment Agreement." (Compl. ¶ 90.) This is not remotely close to

the specificity that Indiana Courts have found sufficient to state a claim, even under a notice pleading standard.  Duty v. Boys & Girls Club of Porter Cty., 23 N.E.3d 768, 775 (Ind. Ct. App. 2014).  The Complaint "also fails to set forth factual allegations from which the Court can infer" that Newtek's alleged conduct "was directed solely at injuring [Plaintiff], as opposed to a justified business interest."  Mfr. Direct LLC v. DirectBuy, Inc., No. 2:05-CV-451, 2006 WL 2095247, at *8 (N.D. Ind. July 26, 2006).  Plaintiff fails to allege that Newtek acted solely to injure Plaintiff and without a legitimate business justification, and Count IV of the Complaint should be dismissed.

## VI.   Plaintiff Fails to Allege a Fraudulent Transfer or a Basis for the Appointing a Receiver

Count V of the Complaint frivolously asserts that Newtek has made "transfers" and incurred "obligations," which Plaintiff alleges are "fraudulent transactions" that the Court should "set aside" by means of a receiver appointed pursuant to Indiana Code § 32-30-5-1(5).  (Compl. ¶¶ 93-99.)  Plaintiff, however, has not alleged any of the elements necessary to establish a fraudulent transfer or for the appointment of a receiver, because she cannot, and Count V of the Complaint must be dismissed.

### A.   Plaintiff Fails to Allege Any of the Elements of a Fraudulent Transfer

Indiana's version of the Uniform Fraudulent Transfer Act provides:

Sec. 14. (a) A transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

20

> (B) intended to incur or believed or reasonably should have believed that
> the debtor would incur debts beyond the debtor's ability to pay as the debts
> became due.

Ind. Code § 32-18-2-14.  The next section of the statute provides:

> Sec. 15. (a) A transfer made or an obligation incurred by a debtor is voidable as to
> a creditor whose claim arose before the transfer was made or the obligation was
> incurred if:
>> (1) the debtor made the transfer or incurred the obligation without receiving a
>> reasonably equivalent value in exchange for the transfer or obligation; and
>> (2) the debtor:
>>> (A) was insolvent at that time; or
>>> (B) became insolvent as a result of the transfer or obligation.

Ind. Code § 32-18-2-15.  Together, these sections set out two causes of action: "actual fraud"

under § 32-18-2-14(a)(1) and "constructive fraud" under §§ 32-18-2-14(a)(2) and 32-18-2-15(a).

Cmedia Servs., LLC v. Rogers, No. 1:15-CV-00435-SEB, 2015 WL 5022167, at *6 (S.D. Ind.

July 31, 2015).  In a claim for actual fraud, the statute provides that "actual intent" is guided by

consideration of the following "badges of fraud":

> (1) the debtor retained possession or control of the property transferred after the
> transfer; (2) the transfer or obligation was disclosed or concealed; (3) before the
> transfer was made or the obligation was incurred, the debtor had been sued or
> threatened with suit; (4) the transfer was of substantially all the debtor's assets;
> (5) the debtor absconded; (6) the debtor removed or concealed assets; (7) the
> value of the consideration received by the debtor was reasonably equivalent to the
> value of the asset transferred or the amount of the obligation incurred; (8) the
> debtor was insolvent or became insolvent shortly after the transfer was made or
> the obligation was incurred; and (9) the transfer occurred shortly before or shortly
> after a substantial debt was incurred.

Ind. Code § 32-18-2-14(b).

 While the Complaint is vague as to the nature of Plaintiff's purported fraudulent transfer

claim, the Complaint makes very clear that Plaintiff cannot allege any facts that would support

the elements necessary to state a cause of action, because none exist.  Importantly, Plaintiff does

not identify even one transfer that is purported to be fraudulent and that Plaintiff asks this Court

to set aside.   Rather, the Complaint refers generally to "transfers" and "obligations" and the conclusory catch-all "[a]ll such fraudulent transactions."  (Compl. ¶¶ 93-94, 98.)

Having not identified a single transfer that is subject to this claim, Plaintiff cannot allege any facts about such transfer that would support the elements necessary to state a cause of action. To be clear, however, nowhere does the Complaint allege any facts from which the Court could conclude that Newtek or banc-serv made a transfer or incurred an obligation with "actual intent to hinder, delay, or defraud any creditor."   There are no factual allegations that even one of the "badges of fraud" is present.[6]   Nor are there any factual allegations that a transfer was made without receiving reasonably equivalent value in exchange, much less that any such transfer left Newtek or banc-serv with unreasonably small assets or the inability to pay its debts, or that either was or became insolvent.   Wine & Canvas Dev. LLC v. Weisser, No. 111 CV 01598, 2017 WL 2905026, at *7 (S.D. Ind. July 7, 2017) (rejecting fraudulent transfer claims where negative inferences of "badges of fraud" were outweighed by neutral inferences, no evidence of transferor's assets and debts was presented, and there was no evidence of insolvency).

### B.     Plaintiff Fails to Allege Any of the Elements for Appointment of a Receiver

The Indiana Code section referenced in the Complaint provides that a receiver may be appointed by the Court:   "[w]hen a corporation: (A) has been dissolved; (B) is insolvent; (C) is in imminent danger of insolvency; or (D) has forfeited its corporate rights."  Ind. Code § 32-30-5-1(5).  (Compl. ¶ 99.)

---

[6]  The Complaint is devoid of any facts that (1) possession or control of property transferred was retained; (2) a transfer was concealed; (3) suit was initiated or threatened prior to a transfer; (4) substantially all assets were transferred; (5) Newtek or banc-serv absconded; (6) Newtek or banc-serv removed or concealed assets; (7) consideration received for a transfer was not reasonably equivalent; (8) Newtek or banc-serv was or became insolvent; or (9) a substantial debt was incurred.

As shown above, Plaintiff has failed to allege any facts that a fraudulent transfer occurred and identifies no transfer that could be set aside by a receiver.  Because Plaintiff has failed to allege the premise upon which her request for the appointment of a receiver is based, her request should be denied for that reason alone.  In addition, however, Plaintiff also has failed to allege any facts that any of the statutory bases for the appointment of a receiver exist.  Plaintiff has alleged no facts that banc-serv has been dissolved, is insolvent, is in imminent danger of insolvency, or has forfeited its corporate rights.  "Before a court … should … appoint a receiver …, facts must be alleged showing sufficient grounds and necessity therefor."  Indianapolis Dairymen's Co-op. v. Bottema, 226 Ind. 237, 244, 79 N.E.2d 399, 403 (1948) (explaining that the appointment of a receiver "cannot be sustained if the allegations fail to show statutory or equitable grounds upon which it may stand").

**VII.   Plaintiff's Asserted Corporate Employee's Lien is "Invalid and Ineffective"**

On July 31, 2018, Defendant banc-serv received a copy of Plaintiff's Notice of Intention of Corporate Employee to Hold Lien Over Corporate Property and Corporate Earnings Pursuant to Ind. Code § 32-28-12-1, et seq. ("Corporate Employee's Lien"), filed with the Hamilton County Recorder on July 27, 2018.  (See Compl. ¶¶ 100-103, Exh. 3.)  Plaintiff asserts in the Corporate Employee's Lien that "[t]he amount of the employee's claims is: $1,000,000, plus attorney's fees and costs."  (Compl., Exh. 3 ¶ 1.)  In addition, Plaintiff states that "[t]he name of the corporation subject to this lien is: ADR Partners, LLC d/b/a banc-serv Partners, LLC and a/k/a banc-serv plus."  (Compl., Exh. 3 ¶ 3.)

The Indiana Corporate Employee's Lien statute provides that:

the employees of a corporation doing business in Indiana, whether organized under Indiana law or otherwise, may have and hold a first and prior lien upon: (1) the corporate property of the corporation; and (2) the earnings of the corporation; for all work and labor done and performed by the employees for the corporation from the date of the employees' employment by the corporation.  A lien under

23

this section is prior to all liens created or acquired after the date of the employment of the employees by the <u>corporation</u>, except as otherwise provided in this chapter.

Ind. Code § 32-28-12-1(a) (emphasis added).

The statute "is clear that it applies only to corporations, which means it is ineffective and invalid against … a limited liability company." <u>Fritz v. Coffey</u>, No. 1:07-CV-115-TS, 2008 WL 2444552, at *4 (N.D. Ind. June 16, 2008). In <u>Fritz</u>, the Court expressly rejected the plaintiff's argument that Ind. Code § 32-28-12-1, <u>et seq.</u>, should be applied to limited liability companies and held that the plaintiff's asserted Corporate Employee's Lien was "invalid and ineffective" against a limited liability company. <u>Fritz</u>, 2008 WL 2444552, at *5.

The Court explained:  "The plain text mentions only 'corporations' and includes no references to other business entities in general or particular examples, such as limited liability companies or partnerships.  This approach is reinforced by the inclusion of limited liability companies and other business entities in other Indiana lien statutes. <u>Fritz</u>, 2008 WL 2444552, at *4 (citing multiple Indiana statutes that expressly apply to limited liability companies).  The Court expressly rejected the plaintiff's argument that "the Court should extend this statute's protection to limited liability companies" because, among other things, "[t]he Plaintiff does not cite to any state or federal cases interpreting this lien statute to apply to limited liability companies, nor could this Court find any….  This is even more the case when the legislature has included limited liability companies in other lien-related statutes but has not (for whatever reason) done so in the lien statute at issue in this case." <u>Fritz</u>, 2008 WL 2444552, at *5.

Defendant banc-serv, which Plaintiff named in the Corporate Employee's Lien as the "corporation subject to this lien," is not a corporation:  it is a limited liability company.  Plaintiff's asserted Corporate Employee's Lien is thus "invalid and ineffective" and her claim to enforce that invalid lien in this action cannot be sustained.  Accordingly, Count VI of Plaintiff's

24

Complaint fails to state a claim and should be dismissed and Plaintiff should be ordered to remove the lien.[7]

## <u>CONCLUSION</u>

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

Accordingly, this action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

s/*Andrew M. McNeil*
Andrew M. McNeil (#19140-49)

BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, In 46204
(317) 684-5000; (317) 684-5173 (Fax)
amcneil@boselaw.com

*Attorney for Defendants*

---

[7]  By correspondence dated August 1, 2018, banc-serv requested that Plaintiff remove her notice of lien from the records of the Hamilton County Recorder in light of the <u>Fritz</u> Court's unambiguous holding that the asserted lien is invalid and ineffective against banc-serv, a limited liability company.  By correspondence dated August 10, 2018, Plaintiff declined to remove the lien, insisting on attempting to enforce the lien in this action.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2018, a copy of the foregoing "Memorandum in Support of Defendants' Motion to Dismiss" was filed electronically. Notice of this filing will be sent to the following counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> Jonathan A. Bont, Esq.
> Stephanie L. Grass, Esq.
> Paganelli Law Group
> 10401 North Meridian Street, Suite 450
> Indianapolis, IN  46290
> jon@paganelligroup.com
> Stephanie@paganelligroup.com

> s/*Andrew M. McNeil*
> Andrew M. McNeil

3494234