UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KERRI L. AGEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-02641-WTL-TAB |
| | ) |
| NEWTEK BUSINESS SERVICES | ) |
| HOLDCO 5, INC., ADR PARTNERS, LLC | ) |
| d/b/a BANC-SERV PARTNERS, LLC, AND | ) |
| a/k/a BANC-SERV PLUS, NEWTEK | ) |
| BUSINESS SERVICES CORP., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Plaintiff Kerri L. Agee ("Ms. Agee"), by counsel, submits this response in opposition to Defendants' Motion to Dismiss.

### Introduction and Summary

The first nine and one-half pages of Defendants' brief in support of their Motion to Dismiss are a smear campaign against Ms. Agee and completely irrelevant as to whether Ms. Agee adequately pled her case. This is not Defendants' case against Ms. Agee; it is Ms. Agee's forum to right wrongs committed against her by Newtek. Newtek acted both directly and indirectly through banc-serv to injure Ms. Agee. Ms. Agee's direct employment relationship *via* her Employment Agreement is with banc-serv. That relationship gives rise to certain of her claims. However, as is apparent from her Complaint, Newtek controlled banc-serv and Newtek used its authority over

1

banc-serv to cause all the harms described in Ms. Agee's Complaint. It is time for Newtek to assume responsibility and defend the case. The Court should deny the Defendants Motion to Dismiss for all of the reasons that follow.

## Argument

I. Standard of Review on a Motion to Dismiss pursuant to Rule 12(b)(6).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts as true all factual allegations in the complaint and draws all permissible inferences in plaintiff's favor. *Boucher v. Finance System of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). To survive a motion to dismiss, a plaintiff must "allege enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "As this analysis suggests, the plausibility standard does not allow a court to question or otherwise disregard nonconclusory factual allegations simply because they seem unlikely." *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). "This does not impose a probability requirement on plaintiffs: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666

(7th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556). In examining the facts and matching them up with the stated legal claims, the Courts gives "the plaintiff the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994).

II. **Ms. Agee sufficiently alleged her wage claims under New York Labor Law in Count I of the Complaint.**

Starting on page 11, Defendants first argue that Ms. Agee has failed to state a Wage Claim under New York Labor Law because she was an executive and, therefore, not entitled to the Labor Law's protections. [Dkt. No. 11, p. 11]. Defendants conveniently ignore the facts that Ms. Agee alleged in her Complaint regarding Defendants' non-recognition and undermining of what would otherwise be executive and managerial functions. [*See, e.g.,* Dkt. No. 1-2, p. 8, ¶¶ 43-47]. By Defendants' own choosing, Ms. Agee was a salesperson with an executive's title; nothing more, nothing less.

In support of their argument, Defendants misstate the holding of the seminal case upon which they rely, *Pachter v. Bernard Hodes Grp., Inc.,* 891 N.E.2d 279 (N.Y. 2008). [*See* Dkt. No. 11, p. 12]. The *Pachter* case addressed the issue of whether an "executive" is protected by sections 190 and 193 of the Labor Law, which the Court answered in the affirmative. The *Pachter* Court did not hold (as Defendants' state) that "an 'executive' cannot be a 'commission salesman' under the . . . Labor Law." Dkt. No. 11, p. 12; *cf. Pachter*, 891 N.E.2d at 612, 615 ("It is evident from the text and structure of . . . the Labor Law that executives are employees within the meaning of

3

Labor Law § 190(2)[,] . . . [even though] executives are removed from the definitions of certain subcategories of employees in Labor Law § 190(5), (6) and (7)."). Simply stated, the *Pachter* Court did not address the issue here, which is whether Ms. Agee fits the definition of a "commission salesman" under New York Labor Law § 190(6).

In defining a "commission salesman," Section 190(6) specifically excludes an employee "whose principal activity is of a supervisory, managerial, executive or administrative nature." *Id.* The question in this case is whether Ms. Agee's "principal activity" was consistent with her title. In *Lauria v. Heffernan*, Business Development Managers and other employees sued a mortgage banking company under New York Labor Law § 191 for unpaid commissions. 607 F.Supp.2d 403 (E.D. N.Y. 2009). In examining the Business Development Managers' duties and responsibilities, the Court noted that they promoted mortgage products and solicited business from mortgage brokers. *Id.* at 408. The Business Development Managers' commissions were based on closing mortgages. *Id.* Finding that the defendants offered no evidence suggesting that the Business Development Managers exercised supervisory or managerial functions, the Court concluded that they fit within the definition of "commissioned salespeople" under Section 190(6).

Similar to the facts in *Lauria*, in this case, Ms. Agee will demonstrate (consistent with her allegations) that her only real job for the Defendants was to sell the businesses' services. [*See, e.g.*, Dkt. No. 1-2, p. 8, ¶¶ 43-47]. At this stage, Ms. Agee has alleged sufficient facts to put her out of reach of Section 190(6)'s exclusion for *true* executives.

4

Defendants also argue that Ms. Agee does not have a civil cause of action for her unpaid expenses under New York Labor Law § 198-c. [Dkt. No. 11, p.13 (citing *Hammell v. Banque Paribas*, 780 F. Supp. 196, 201 (S.D.N.Y. 1991))]. Indeed, the *Hammell* case stands for this proposition. However, a more recent decision out of the Southern District of New York is contrary to *Hammell*. *See Castagna v. Luceno*, 2011 WL 1584593, at *21 (S.D. N.Y. 2011) ("A private right of action comports with the remedial purposes of the Labor Law and the language of Section 198 . . ."). "The New York Labor law was enacted to protect employees, and to remedy the imbalance of power between employers and employees." *Chu Chung v. New Silver Palace Restaurants, Inc.*, 272 F. Supp.2d 314, 317 (S.D. N.Y. 2003) (concluding that Section 198-b, which is also a criminal provision, provides a civil cause of action). This case highlights the imbalance of power recognized by the Southern District of New York in 2003, and the Court should not allow it to go unchecked. The Court should deny Defendants' Motion to Dismiss in so far is it seeks dismissal of Count I of Ms. Agee's Complaint – Violations of New York Wage Payment Laws. [Dkt. No. 1-2].

### III. Ms. Agee sufficiently alleged a breach of contract in Count II of the Complaint.

Defendants assert that Ms. Agee has not sufficiently pled a claim for breach of contract. In support, Defendants focus solely on Ms. Agee's allegation that she was assigned to duties and responsibilities that were materially inferior to and inconsistent with her position as Chief Executive Officer. [Dkt. No. 11, p. 14]. Defendants seem to suggest that because her Employment Agreement separately mentions "material breach," her demotion allegations cannot form an independent

5

bases for a breach of contract claim. That is not a correct statement of the law. Contractual definitions do not change the basic tenets of a breach of contract action. The demotion allegation is, in and of itself, a sufficient allegation of breach. What is more, the demotion allegation is not the only allegation that supports Ms. Agee's breach of contract claim. Indeed, in paragraph 55 of her Complaint, Ms. Agee alleged that one of the reasons she resigned for Good Reason was that her compensation was changed from what she was entitled to under her Employment Agreement. [Dkt. No. 1-2, p. 10, § 55]. That is also a breach.

As alleged in the Complaint, the Employment Agreement is governed by the laws of the State of New York [*See* Dkt. 1-2 at ¶ 30]. Under New York law, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *PFM Packaging Machinery Corp. v. ZMY Food Packaging, Inc.*, 16 N.Y.S.3D 298, 299-300 (N.Y. App. Div. 2015). In her Complaint, Ms. Agee alleged the existence of the Employment Agreement as an enforceable contract. [Dkt. 1-2 at ¶ 78]. Ms. Agee also alleged her performance pursuant to the contract. [Dkt. 1-2 at ¶ 79]. Most importantly, for purposes of Defendants' motion, Ms. Agee alleged banc-serv's breach of the Employment Agreement – "banc-serv (at the direction and under the control of Newtek)" did not pay her amounts owed under the Employment Agreement and changed her duties from those which she was promised under the Employment

Agreement. [Dkt 1-2 at ¶ 55]. [*See also* Dkt. No. 1-2, p. 20, ¶ 2 (defining Ms. Agee's duties and responsibilities)].

More specifically, as provided for in the Employment Agreement and alleged in the Complaint, Ms. Agee was entitled to "a total severance payment (the 'Severance Payment') equal to (i) Executive's base salary in effect at the time of termination for the entire Term, less (ii) all amounts paid the Executive under this Agreement." [Dkt. 1-2 at ¶ 57]. And, as alleged in the Complaint, banc-serv (at Newtek's direction and under its control) has failed and refused to pay Ms. Agee's Severance Payment, any amounts for her Incentive Compensation and Referral Bonus, or her annual bonus. [Dkt 1-2 at ¶ 58-61]. These are all sufficiently alleged breaches of the Employment Agreement under New York law. Finally, Ms. Agee alleged that she has suffered damages due to these breaches. [Dkt 1-2 at ¶ 80].

To satisfy the requirement of notice pleading on a claim for breach of contract, "[p]laintiffs simply need to allege enough information so that [Defendants have] at least minimal notice of the claim or claims being asserted." *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F.Supp.2d 829, 847 (S.D. Ind. 2005). Accepting as true all factual allegations in Ms. Agee's complaint for breach of contract and drawing all permissible inferences in her favor, Ms. Agee's complaint for breach of contract in Count II must survive a motion to dismiss. *See Boucher v. Finance System of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018).

### IV. Ms. Agee sufficiently alleged a basis to pierce the corporate veil and hold Newtek liable in Count III of the Complaint.

Next, Defendants argue that Ms. Agee has failed to allege facts to permit her to pierce the corporate veil. Defendants assert that Delaware law applies to this issue because banc-serv is a Delaware limited liability company. For purposes of Defendant's Motion, Ms. Agee concedes that point. It makes no difference, however, because under Delaware law, Ms. Agee alleged facts sufficient to pierce the corporate veil and hold Newtek liable for banc-serv's conduct.

Defendants quote *In re Simplexity, LLC* wherein the court stated "[p]iercing the corporate veil is limited to exceptional circumstances and requires alleging facts which demonstrated that the entities operated as one entity resulting in injustice or unfairness." [Dkt. No. 11, pp. 15-16]. Ms. Agee alleged precisely the sort of exceptional circumstances in her Complaint.

First, Ms. Agee alleged that Newtek Business Services Holdco 5, Inc. (the entity that acquired banc-serv) is a wholly owned subsidiary of Newtek. [Dkt. No. 1-2, p. 2, ¶ 5].[1] Then, Ms. Agee alleged that Newtek (not an independent subsidiary with separate management) by and through its CEO Barry Sloane approached her with the intent to acquire banc-serv. [Dkt. No. 1-2, p. 4, ¶¶ 18-20]. Subsequent to

---

[1] Ms. Agee was admittedly unaware that an entity called "Newtek LSP Holdco, LLC" whose members are "Newtek Business Services Holdco 5, Inc." and "Wilshire Holdings 1, Inc." is *now* the single owner/member of banc-serv. [*See* Dkt. No. 11, p. 16 and Dkt. No. 3]. Substantively, it makes no difference, as all entities are owned by Newtek. *Id.* In alleging banc-serv's ownership, Ms. Agee relied on Newtek's allegations in its Arbitration Claim against Ms. Agee, wherein Newtek and Newtek Business Services Holdco 5, Inc. alleged that banc-serv Acquisition, Inc. changed its name to Newtek Business Services Holdco 5, Inc. and that Newtek, through its wholly owned consolidated subsidiaries, owns 100% of the membership interests of banc-serv. [*See* Dkt. No. 1-2, p. 5, ¶¶ 24-25]. Apparently, the "corporate formalities" of Newtek's subsidiaries are something like an amoeba, but even an amoeba has a nucleus.

Newtek's acquisition of banc-serv, Ms. Agee alleged that Newtek, without the consent of Ms. Agee as the CEO of banc-serv, took at least as much as $400,000.00 from banc-serv's account(s) as a distribution to Newtek's shareholders. [Dkt. No. 1-2, p. 8, ¶ 38]. Similarly, Ms. Agee alleged that Newtek applied excessive costs as "corporate overhead" to banc-serv's books in order to make it appear less profitable in order to reduce Ms. Agee's annual bonus. [Dkt. No. 1-2, ¶¶ 40, 42]. Ms. Agee further alleged that she, as the "President and CEO" of banc-serv was cut out from banc-serv's finances; and that Newtek completely controlled banc-serv's financial reporting. [Dkt. No. 1-2, p. 9, ¶ 46]. Ms. Agee alleged that, although she was the "President and CEO" of banc-serv, Newtek's CEO, Barry Sloane, told her what to do and when to do it. [Dkt. No. 1-2, ¶ 44. *See also* id., ¶¶ 45-50 (alleging further control of banc-serv by Newtek)]. This culminated the day Ms. Agee resigned, after which Barry Sloane called her to say "You're Fired!" [Dkt. No. 1-2, ¶ 56]. Ultimately, Newtek's actions have had their desired effect. As Ms. Agee alleged, Newtek has let the drain out on banc-serv such that it is three months arrears on rent and is shuttering its doors. [Dkt. No. 1-2, ¶¶ 63, 65].

As discussed above and as Ms. Agee alleged in her Complaint, six out of the seven factors Delaware courts consider for disregarding the corporate form are present. [Dkt. No. 11, p. 17]. Ms. Agee alleged undercapitalization, failure to observe corporate formalities, nonpayment of dividends (in this case, Ms. Agee's severance and bonus/incentive payments), insolvency of banc-serv, siphoning banc-serv's funds by Newtek and its majority shareholder CEO Barry Sloane, and the fact that banc-

9

serv is merely a façade for the operations of Newtek and its CEO Barry Sloane. The remaining factor, absence of corporate records, can only be ascertained through discovery.

This is a case about "injustice and unfairness." [Dkt. No. 11, p. 17 (quoting *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 529 (D. Del. 2008)]. Newtek destroyed banc-serv, and Newtek should be liable for Ms. Agee's claims. The Court should deny Defendants' motion to dismiss Count III of the Complaint.

### V. Ms. Agee sufficiently alleged tortious interference with a contract in Count IV of the Complaint.

Next, Defendants assert that Ms. Agee has not alleged any facts to support the third and fourth elements of a tortious interference claim. The elements of tortious interference with a contractual relationship are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Winkler v. V.G. Reed & Sons*, 638 N.E.2d 1228, 1235 (Ind. 1994); *Bragg v. City of Muncie*, 930 N.E.2d 1144, 1147 (Ind. Ct. App. 2010). Ms. Agee alleged each of these elements in her Complaint.

Defendants assert that Ms. Agee has not alleged any facts to the effect that Newtek intentionally induced banc-serv's conduct or acted without sufficient justification. To the contrary, in her Complaint, Ms. Agee alleged that at the direction of Newtek, Ms. Agee's role as the President and Chief Executive Officer of banc-serv was a nullity; she was cut out and undermined from the company she founded and

10

grew for fourteen years. [Dkt. No. 1-2 at ¶ 43-47]. Ms Agee also alleged that Newtek intentionally decreased banc-serv's net income, which was the basis for Ms. Agee's annual bonus under the Employment Agreement. [Dkt. No. 1-2 at ¶ 41-42, 49]. Further, Ms. Agee alleged that Newtek took $400,000.00 from banc-serv's account(s) (and likely more) while artificially decreasing banc-serv's net revenue, [Dkt. No. 1-2, p. 8, ¶¶ 38, 40, 42], which caused banc-serv to breach its agreement with Ms. Agee by not paying her amounts owed to her under the Employment Agreement [Dkt 1-2 at ¶ 55].

At this stage in the litigation, Ms. Agee has also alleged facts which demonstrate that Newtek's conduct was unjustified, that is it was solely directed at injuring Ms. Agee rather than for a legitimate business purpose. Ms. Agee alleged that Newtek's stock has gained value since acquiring banc-serv. [Dkt. No. 1-2, p. 11, ¶ 64]. This was Newtek's anticipation in acquiring banc-serv from Ms. Agee. [*Id.*, p. 2, ¶ 2]. Thus, there is no legitimate reason why Newtek would artificially make banc-serv appear to be a losing proposition, but for to create a situation whereby Ms. Agee did not receive the compensation to which she was contractually entitled. Newtek used banc-serv to injure Ms. Agee. Ms. Agee alleged that Newtek went so far as to allow/force banc-serv to default on its rent, so that Ms. Agee would be stuck with the bill. [*Id.*, p. 12, ¶¶ 65-66]. Again, there is no justification for this action, but to injure Ms. Agee. Ms. Agee alleged that Newtek breached its Referral Promotion Agreement with banc-serv, in order to cause banc-serv to breach its agreement to pay Ms. Agee a Referral Bonus under her Employment Agreement. [Dkt. No. 1-2, p. 10, ¶ 54]. This

11

is a prime example of Newtek acting maliciously, for no other purpose than to injure Ms. Agee.

Examining all these facts and matching them up with the legal theory for tortious interference with a contract, the Court must give Ms. Agee "the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994). *See Duty v. Boys and Girls Club of Porter County*, 23 N.E.3d 768, 775 (Ind. Ct. App. 2014) (reversing dismissal of tortious interference claims). Ms. Agee's allegations, taken together, lead to a reasonable inference that Newtek's actions were unjustified, as that terms is defined by the courts. *See, e.g., Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 562 (S.D. Ind. 1988) (recognizing unjustified conduct as "disinterested malevolence" and "exclusively directed to injury and damage of another"). Ms. Agee satisfied her burden in pleading this claim, and the discovery process will reveal whether she can continue to pursue it. The Court should deny Defendants' motion to dismiss Count IV of the Complaint.

## VI. Ms. Agee sufficiently alleged fraudulent transfer under Count V of the Complaint.

Defendants next argue that Ms. Agee has not alleged sufficient facts to obtain relief under the Indiana Uniform Fraudulent Transfer Act, Indiana Code § 32-18-2-1, *et seq.* In particular, Defendants assert that Ms. Agee has not alleged one of the "badges of fraud" enunciated in Indiana Code § 32-18-2-14(b). [Dkt. 11, p. 22]. To be clear, the "badges of fraud" analysis only comes into play if Ms. Agee is proceeding on an "actual intent" claim under Indiana Code § 32-18-2-14(a)(1). Ms. Agee has and

will continue to have that avenue of relief available to her in the event that discovery bears out further evidence of "actual intent." *See Richter v. Corporate Finance Associates*, LLC, No. 1:06-cv-1623-JDT-TAB, 2007 WL 1164949, at *2 (S.D. Ind. April 19, 2007) (fraud pleading standard relaxed where facts are peculiarly within the adversary's knowledge).

Even now, Ms. Agee has alleged facts in support of certain of the "badges of fraud." First, under (4) the transfer was of substantially all of the debtor's assets – Ms. Agee alleged that Newtek took $400,000.00 from banc-serv's account(s) (and likely more) while artificially decreasing banc-serv's net revenue. [*See, e.g.*, Dkt. No. 1-2, p. 8, ¶¶ 38, 40, 42]. Second, under (6) the debtor removed or concealed assets – Ms. Agee alleged that Newtek has access to the system by which it was supposed to track revenue generated by Ms. Agee's referrals, [*see id.* at pp. 7-8, ¶¶ 32-34].[2] Finally, under (8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred – Ms. Agee alleged, from an independent source, that Newtek is contemplating shuttering banc-serv's operations even though Newtek's stock value has increased, [*see id.* at p. 11, ¶¶ 63-64], and that Newtek forced banc-serv to artificially incur an obligation to the Landlord at the same time, [*see id.* at p. 11, ¶¶ 62, 65, 66].[3] These are facts which, at this stage, are sufficient allegations of "actual intent" to defraud. See *Indianapolis Indiana Amaco*

---

[2] To remove any doubt on this issue, Ms. Agee could presently amend her Complaint to include an allegation that "shortly after June 24, 2016, Newtek denied Ms. Agee access to the NewTracker™ System."

[3] Ms. Agee could presently allege that, since the time of filing suit, banc-serv defaulted on its lease, and Ms. Agee was forced to pay the Landlord on her Guaranty.

13

*Dealers Advertising Pool v. Anderson*, 746 N.E.2d 383, 391 (Ind. Ct. App. 2001) ("[T]he facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern from which an inference of fraudulent intent may be drawn.").

Further, under Indiana Code § 32-18-2-14(a)(2), there can be no doubt Ms. Agee has alleged sufficient facts to state a claim for relief. Again, Ms. Agee alleged a transfer without receiving anything in return, *i.e.*, the $400,000.00 distribution to Newtek. Ms. Agee also alleged obligations incurred by banc-serv in favor of Newtek without receiving anything of value, *i.e.*, the use of banc-serv employees by Newtek for which banc-serv was never reimbursed. [*See*, Dkt. No. 1-2, p. 9, ¶ 49]. Ms. Agee alleged that banc-serv, at the direction and under the control of Newtek, incurred debts beyond its ability to pay as the debts became due, *i.e.*, debts to Ms. Agee (both directly, by failing to compensate her pursuant to the Employment Agreement, and indirectly, by failing to pay rent to the Landlord and other creditors which caused Ms. Agee to pay for banc-serv's debts and obligations). Finally, Ms. Agee alleged sufficient facts to, at the very minimum, establish Newtek should have believed that banc-serv was incurring debts beyond its ability to pay as the debts became due. Indeed, that is a cornerstone theme of Ms. Agee's Complaint. [*See, e.g.*, Dkt. No. 1-2, p.2, ¶ 3].

With regard to a receiver, it does not appear that there is much of banc-serv left over which to appoint a receiver. As such, Ms. Agee is not moving for the appointment of a receiver at this time. If Ms. Agee learns of facts to the contrary, she will brief the Court on the issue in a separate motion.

### VII. Ms. Agee sufficiently pled her claim to enforce a corporate lien under Count VI of the Complaint.

Defendants argue that Count VI of Ms. Agee's Complaint should be dismissed because the Indiana Corporate Employees' Liens Statute, Ind. Code § 32-28-12-1, *et seq.*, does not specifically mention limited liability companies as being subject to liens in favor of employees to whom they have failed to pay earned wages. Defendants cite to a Northern District case, which supports their argument. [Dkt. No. 11, p. 24 (citing *Fritz v. Coffey, No.* 1:07-CV-115-TS, 2008 WL 2444552 (N.D. Ind. June 16, 2008)]. There are numerous reasons why the Court should not follow the Northern District's decision.

In a case applying Indiana law that is before the Court premised on diversity jurisdiction, the Court's "task is to predict how the Indiana Supreme Court would rule if the case were before it." *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 467 (7th Cir. 2017). In Indiana, limited liability companies are a relatively new creations of statute. Ind. Code § 23-18-1-1, *et seq.* (enacted in 1993). To the contrary, the Indiana Corporate Employees' Lien Statute has been around since before the turn of the century. *See generally Forrest et al. v. Corey*, 64 N.E. 45 (Ind. Ct. App. 1902). The purposes of an LLC are to protect shareholders from personal liability, like a corporation, and to provide through pass through taxation, like a partnership. *Troutwine Estates Development Co., LLC v. Comsub Design and Engineering, Inc.*, 854 N.E.2d 890, 898 (Ind. Ct. App. 2006). Neither of these purposes are jeopardized by enforcing Ms. Agee's lien in this case.

In fact, although not alleged in her Complaint, Ms. Agee could amend her Complaint to include an allegation that based on information and belief, banc-serv Partners, LLC, has always elected corporate tax treatment. In essence, banc-serv Partners, whose sole member is an LLC (whose sole members are both New York Corporations), [*see* Dkt. No. 11, p. 2], is no different than a corporation. *See McNamee v. Department of the Treasury*, 488 F.3d 100, 109 (2d Cir. 2007) (discussing the different tax treatment options available to a single-member LLC and acknowledging the Internal Revenue Service's recognition that LLCs are "virtually indistinguishable from a corporation").

The Indiana Supreme Court declines to place form over substance when dealing with corporate formalities. *See Barth v. Barth*, 659 N.E.2d 559 (Ind. 1995). In *Barth*, a minority shareholder in a corporation filed suit against the corporation directly, instead of bringing a single action of all shareholders on behalf of the corporation pursuant to the Indiana Business Corporation Law, Ind. Code § 23-1-32-1, *et seq*. *Id.* at 560. The allegations in *Barth* were very similar to this case, *e.g.*, that the majority shareholder appropriated corporate funds for his own benefit and used corporate employees without compensating the corporation. *Id.* The Indiana Supreme Court recognized the reasons for requiring derivative actions, namely, the protection of corporate creditors, the protection of all shareholders' interests, and adequately compensating shareholders by increasing the value of their shares. *Id.* at 561. Much like in this case, the rationales for the strict application of the Indiana Business Corporation Law were not adversely affected by allowing the plaintiff in

16

*Barth* to proceed directly against the corporation. *Id. See also* note 1, above. The Indiana Supreme Court held that trial courts have discretion to determine whether a plaintiff must proceed with a derivative action according to the Indiana Business Corporation Statute or can instead proceed directly against the corporation on his or her own behalf. *Id.* at 562.[4]

The purpose of the Indiana Corporate Employees' Lien Statute is to protect employees from the situation presented in this case. An employer who shirks payment to its employee is often indebted in other respects. *See* Dkt. No. 1-2, p. 12, ¶ 65. The employee who furnished labor to the company has forfeited that which she can never get back, her time. As such, Indiana has recognized that the employee's interest should take priority over that of a creditor who has furnished goods, equipment, or real estate. The Court should interpret the Statute broadly to protect the class of persons it was designed to protect. The United States Bankruptcy Code does not specifically mention limited liability companies and still courts apply its provisions to the protection of and distribution of limited liability companies' assets. *See In re ICLNDS Notes Acquisition, LLC*, 259 B.R. 289, 292 (Bankr. N.D. Ohio 2001). Any other result would not make sense. Similarly, here, the Indiana Supreme Court would not place form over substance. It would apply the Lien Statute to Ms. Agee's case. The Court should Defendants' Motion to Dismiss in so far is it seeks

---

[4] Still, the Indiana Supreme Court decided that the general rule would not always apply with regard to corporations that have a relatively small number of shareholders. *Id.* at 561-62 ("However, it is important to keep in mind that the principles which gave rise to the rule requiring derivative actions will sometimes be present even in litigation involving closely-held corporations.").

dismissal of Count VI of Ms. Agee's Complaint – Claim to Enforce Lien. [Dkt. No. 1-2].

## Conclusion

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

*/s/ Jonathan A. Bont*

Jonathan A. Bont (28476-49)
Stephanie L. Grass (32613-29)
PAGANELLI LAW GROUP
10401 N. Meridian St., Suite 450
Indianapolis, IN  46290
Tel:  317/550-1855
Fax:  317/569-6016
E-Mail:  jon@paganelligroup.com
stephanie@paganelligroup.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed September 21, 2018, through the Court's CM/ECF system.  Notice of this filling will be sent to all other parties registered to receive such notice by operation of the Court's electronic filing system.

*/s/ Jonathan A. Bont*

Jonathan A. Bont (28476-49)